**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jimmie Harold PRIMROSE, Defendant-Appellant.**

No. 82–1842.

United States Court of Appeals, Tenth Circuit.

Sept. 30, 1983.

Rehearing Denied Feb. 17, 1984.

Gene Stipe (Anthony M. Laizure with him on brief), of Stipe, Gossett, Stipe, Harper, Estes, McCune & Parks, McAlester, Okl., for defendant-appellant.

Gary L. Richardson, U.S. Atty., Muskogee, Okl. (Edward M. Kimmel, Asst. U.S. Atty., Muskogee, Okl., with him on brief), for plaintiff-appellee.

Before HOLLOWAY, McWILLIAMS, and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Jimmie Harold Primrose was indicted on thirty-eight counts of mail fraud, 18 U.S.C. §§ 2, 1341 (1976), and three counts of extortion, 18 U.S.C. § 1951 (1976), in connection with an alleged scheme to defraud the citizens of Murray County, Oklahoma. A jury convicted him of thirteen counts of mail fraud. On appeal, he asserts that: (1) the trial court erred in not dismissing the indictment for unnecessary delay in bringing him to trial; (2) the voir dire of jurors was inadequate; (3) the Government failed to prove a use of the mails for the purpose of executing a scheme to defraud; (4) the trial court abused its discretion by admitting evidence of crimes not charged in the indictment; (5) the prosecutor's references to other county commissioners were improper and prejudicial; (6) the prosecutor improperly cross-examined defense witnesses; and (7) certain remarks the prosecutor made

during closing argument constituted improper vouching for witnesses. For the reasons set out below, we affirm.

## I.

### BACKGROUND

In setting forth the circumstances giving rise to this appeal, we view the evidence in the light most favorable to the jury's verdict. *United States v. Petersen,* 611 F.2d 1313, 1317 (10th Cir.1979), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980). Primrose was elected county commissioner for district 3 of Murray County in 1969, and was re-elected for successive terms. In Oklahoma, counties are divided into three districts, and each district is represented by an elected commissioner. One witness described county commissioners as the "managers" and "operators" of the county. Rec., supp. vol. I, at 155. Among other things, they are responsible for maintaining county roads and bridges, a duty that includes authority to make purchases of supplies and equipment.

Primrose was charged with defrauding the citizens of Murray County by purchasing various materials and supplies for the county in exchange for kickbacks from the vendors, and by placing orders for materials and supplies that were not to be delivered and splitting with the vendors the amount paid by the county for the undelivered goods.[1] The Government's four chief wit-

1. More specifically, the indictment charged:
"COUNT 1
"(18 U.S.C. 1341 and 2)
"1. During the period commencing on or about October 9, 1971, and continuing thereafter to on or about, May 14, 1980,
JIMMIE HAROLD PRIMROSE
the defendant herein, while serving as County Commissioner of Murray County, Oklahoma, devised and intended to devise a scheme to defraud the citizens of Murray County by depriving the citizens of that County of their right to have Murray County's business conducted openly, honestly, and impartially, free from corruption and undue influence.
"The scheme to defraud the citizens of Murray County was in substance as follows:
"2. As part of the scheme to defraud, Jimmie Harold Primrose, in his official capacity as County Commissioner of Murray County, did place orders and purchase road and bridge building and maintenance materials and supplies for Murray County from various vendors, and in particular, Ernest Leslie Irwin, d/b/a either Independent Industries, Inc., or Machinery Parts and Service Co.; Tommy L. Craft, d/b/a T.L. Craft Road and Bridge Materials; Billy J. Klutts, d/b/a Okie Equipment Co.; and Edward B. Wilson, d/b/a Wilson Materials Co., in exchange for which the defendant did receive from these sellers of road and bridge building and maintenance supplies, cash kickbacks.
"3. It was a further part of the scheme to defraud that the defendant, Jimmie Harold Primrose, in his official capacity as County Commissioner of Murray County, knowingly did place orders with various vendors, and, in particular, Ernest Leslie Irwin, d/b/a Independent Industries and Billy J. Klutts, d/b/a Okie Equipment Company for road and bridge building and maintenance materials and supplies which were not actually to be delivered to the County in exchange for

which Ernest Leslie Irwin and Billy J. Klutts did pay to the defendant, Jimmie Harold Primrose, in cash, a sum of money representing approximately 50% of the billed value of the fictitious and nonexistent goods which were represented to have been sold to the County.
"4. That on or about May 24, 1977, in the Eastern Judicial District of Oklahoma, Jimmie Harold Primrose, the defendant herein, for the purpose of executing the aforesaid scheme to defraud, and attempting to do so, did cause to be placed in an authorized mail *depository, to be sent and delivered by the* U.S. Postal Service, from Murray County, Oklahoma, located in the Eastern Judicial District of Oklahoma to Okie Equipment Company, Meeker, Oklahoma, an envelope containing County Warrant Number 646, in the amount of $714.00, all in violation of Title 18 United States Code, Sections 1341 and 2. Rec., vol. I, at 1–2. Counts 2–7 incorporated the allegations contained in Count 1 except for the date, warrant number, and amount described in paragraph 4, listing instead six other warrants addressed to Okie Equipment Co. Counts 8–34 incorporated allegations contained in the first three paragraphs of Count 1, then charged that Primrose on or about specified dates, "for the purpose of executing the aforesaid scheme to defraud, and attempting to do so, did cause" Independent Industries, Inc. (Counts 8–23), Machinery Parts and Service Co. (Counts 24–27), and T.L. Craft Road & Bridge Material (Counts 28–34) "to place in an authorized mail depository to be sent and delivered by the U.S. Postal Service to Murray County" envelopes containing specified invoices for specified amounts "which caused the issuance" of specified county warrants, all in violation of 18 U.S.C. §§ 2, 1341 (1976). Rec., vol. I, at 3–4. Counts 35–38 alleged that Primrose entered into lease-purchase agreements

nesses were vendors who testified about the alleged kickbacks and "split deals" or "50–50 splits."

The first witness, Edward Wilson, had been a salesman for Long Brothers Material Co. from 1973 to 1974, then had his own firm, Wilson Material Co., from 1974 to 1979.[2] Wilson testified that he had paid Primrose ten percent cash kickbacks when Primrose placed orders with him. He also testified about several "split deals" he had made with Primrose:

> "Well, we would just meet and visit and discuss what we was going to do. And he would say, or I would say let's make a deal for, you know, a couple of hundred, or 150, and then I would just double it. And then I would go to my books and he would say put it on a tin horn or put it on lumber. And I would just figure out the amount it would take to come up to that total."

Rec., supp. vol. I, at 253. Wilson would pay Primrose half the total, bill the county for the goods that he never delivered, and receive his warrant (the county's "check") in the mail.

The three other vendors gave similar testimony. Bill Klutts, a co-owner of Okie Equipment Co., sold supplies and equipment to counties from 1977 to 1979. He testified that "[i]n most all cases there was a ten percent kickback built right into your price of supplies, tin horns, and lumber, grader blades." Id. at 308. He identified purchase orders, invoices, and warrants relating to

seven transactions he had had with Primrose. These transactions constituted Counts 1–7 of the indictment. He testified that he had paid Primrose at least a ten percent kickback on each transaction and that the transaction described in Count 2 "was probably a split order." Id. at 318–19. He said that his invoices had been mailed to Murray County and that Murray County had mailed him warrants in payment.

T.L. ("Tommy") Craft, the owner of T.L. Craft Materials, Inc., sold bridge lumber and grader blades to Primrose's district. He testified to seven transactions, corresponding to Counts 28–34, on which he had paid Primrose ten percent kickbacks.[3] He also testified that he had paid Primrose kickbacks on twelve other transactions that were not listed in the indictment[4] and "[m]ight have split one or two with him back there." Id. at 378. Craft stated that his company's invoices had been mailed to the county and the county had mailed its warrants to him.

E.L. ("Cotton") Irwin, who represented Independent Industries, Inc., and Machinery Parts & Service Co., also related his dealings with Primrose. He said that he usually had paid Primrose a ten percent kickback, although he had paid a smaller kickback on machinery and also had made a few "splits" with him.[5] Irwin stated that his companies had mailed invoices to the county and had received the county's warrants in the mail.

with E.L. Irwin for which he received kickbacks. Counts 39–41 charged Primrose with violations of the Hobbs Act, 18 U.S.C. § 1951 (1976).

The jury found Primrose not guilty of Counts 8–27, 31, and 35–41, and guilty of Counts 1–7, 28–30, and 32–34. Our review is of course limited to the 13 counts of which he was found guilty.

2. Because he had not done business with Primrose after 1976, Wilson's testimony only concerned offenses which could not be prosecuted because of the five-year statute of limitations. See 18 U.S.C. § 3282 (1976). The trial judge admitted the testimony with a cautionary instruction that it was only to be considered to show the existence of a plan or scheme. See Fed.R.Evid. 404(b).

3. The jury acquitted Primrose of Count 31, although it found him guilty of Counts 28–30 and 32–34.

4. The judge admitted this testimony only "for the limited purpose of establishing a plan or scheme," rec., supp. vol. I, at 374, and gave a cautionary instruction to that effect.

5. The jury acquitted Primrose on Counts 8–27 and 35–38, which were the mail fraud counts relating to Irwin.

Much of Irwin's testimony related to about twenty transactions that were not listed in the indictment. The judge repeatedly cautioned the jury to consider this testimony and corresponding exhibits "for the limited purpose of establishing a common plan or scheme." Rec., supp. vol. I, at 442; see id. at 457, 461.

State law requires a notarized statement of noncollusion on every invoice submitted to a county for payment of $1,000 or more. Each supplier must state "that (s)he has made no payment directly or indirectly to any elected official, officer or employee of ... any county ... of money or any other thing of value to obtain payment." Okla. Stat. tit. 74, § 3109 (1981). Each of the four vendors testified that he was required to submit such affidavits with his purchase orders and invoices in order to get paid.

The defense presented nineteen witnesses who all said they never knew Primrose to take kickbacks. Three women who had done office work for the three Murray County commissioners testified that Irwin, Klutts, and Craft periodically had come into the county courthouse, sometimes to deliver invoices, sometimes to pick up warrants, and sometimes to call on the commissioners. The women had never witnessed kickbacks. One man said he had worked for Irwin for several years and had never heard anything about kickbacks. Ten vendors testified that they had done business with Primrose and had never paid kickbacks nor had they been asked to do so. Two mechanics for Primrose's district testified that certain equipment that Irwin testified had not been delivered in fact had been installed on a county bulldozer. Three witnesses said Primrose had a good reputation for honesty. Finally, Primrose himself testified that he had never taken kickbacks and, on the contrary, had stopped doing business with Klutts when offered a kickback.

## II.

### PRE–TRIAL DELAY

■ Primrose was indicted November 19, 1981, on thirty counts of mail fraud and one count of extortion. On December 31 the Government gave Notice of Dismissal of the indictment. The trial court granted the Government leave to dismiss on January 4, 1982, the date the case was originally scheduled to go to trial. *See* Fed.R.Crim.P. 48(a). Three days later a second indictment was returned against Primrose, charging him with thirty-eight counts of mail fraud and three counts of extortion. Primrose was

arraigned and trial was set for March 1. Primrose moved to dismiss the second indictment under Federal Rule of Criminal Procedure 48(b) on the ground of unnecessary delay. Primrose appeals the district court's denial of this motion. He does not, however, allege any violation of the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (1976), of the speedy trial clause of the Sixth Amendment, or of the due process clause of the Fifth Amendment.

Rule 48(b) provides:

"If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint."

The rule is applicable only to post-arrest situations. *United States v. Lovasco,* 431 U.S. 783, 789 n. 8, 97 S.Ct. 2044, 2048 n. 8, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 319, 92 S.Ct. 455, 462, 30 L.Ed.2d 468 (1971); *United States v. McManaman,* 606 F.2d 919, 922 n. 5 (10th Cir.1979). Because Primrose was not arrested prior to indictment, Rule 48(b) is inapplicable.

## III.

### VOIR DIRE OF JURORS

■ Primrose asserts that voir dire in this case was inadequate because all the jurors had read or heard about the ongoing county commissioner investigation. He contends that the voir dire was not sufficiently broad to permit the trial court to assess the effect of this publicity on the jurors' ability to be impartial. He also argues that each juror should have been questioned individually out of the presence of other jurors.

We have considered virtually identical arguments in *United States v. Whitt,* 718 F.2d 1494 (10th Cir.1983), filed this date. In *Whitt,* as in this case, the trial judge asked general questions regarding the potential jurors' exposure to publicity, and then questioned individual jurors about their

ability to be fair and impartial despite what they had heard or read. Based on the authorities and the analysis set forth in *Whitt*, we conclude that the voir dire here was adequate and did not constitute reversible error.

## IV.

## MAIL FRAUD

█ The mail fraud statute provides:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

18 U.S.C. § 1341 (1976). Primrose argues that, even assuming the Government showed mailings and the existence of a scheme to defraud, the mailings alleged were insufficiently related to the purported scheme to sustain his convictions. The question before us, then, is whether the county's mailings of warrants to Klutts, and Craft's mailings of invoices to the county, were for the purpose of executing a scheme to defraud.[6]

"The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud." *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). However, "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element." *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954).

Primrose argues that because the mailings alleged in the indictment occurred after the kickbacks were paid, they could not be for the purpose of executing the scheme inasmuch as the scheme would have already reached fruition. Primrose's view of the scheme is too narrow. His argument rests on limiting the scheme to his receipt of kickbacks. In fact, however, the scheme to defraud the citizens of Murray County necessarily included the vendors' receipt of payment from the County: the scheme could not reach fruition before that occurred.

*United States v. Bottom,* 638 F.2d 781 (5th Cir.1981), involved a scheme strikingly similar to that in the instant case. The defendant commissioners raised the same argument Primrose does here, but the court rejected it:

"Concerning the next issue as to the sufficiency of the evidence to prove mail fraud, the defendants argue that the scheme was complete once they received their money from Baldwin, which occurred up-front before Baldwin submitted his invoices to the county, before the county submitted checks to Baldwin, and before the commissioners initialed copies of the checks; and that if the scheme was complete, then the mailings were not sufficient to bring the transactions within the scope of the mail fraud statute. The defendants rely on *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974).

" . . . .

"The fraudulent scheme in the instant case employed mailings which were integral to the execution of the fraudulent plans and which were not made after the fruition of the fraud but were necessary to complete the scheme. The scheme was not complete when Baldwin paid the de-

---

**6.** Primrose was convicted on Counts 1–7, which were based on the warrants mailed to Klutts, and Counts 28, 29, 30, 32, 33, and 34, which were based on invoices mailed by Craft.

*See* note 1 *supra.* The mailings in the Wilson and Irwin transactions did not result in convictions, and are therefore not before us on appeal.

fendants 'up-front' the bogus or padded amounts in the invoices because Baldwin still needed the assistance of the defendants, who were the only ones who knew about the fraud and who had control of all the paperwork in their districts, to initial copies of the checks which reflected payment of the phony invoice attached to it. Furthermore, the county was not defrauded and the scheme complete until the checks were approved by the commissioners, the money released and the checks mailed to Baldwin. From the beginning of the scheme the defendant commissioners, who knew that the invoices were bogus or padded, were also aware that Baldwin would be paid by a check mailed to him by the county. Therefore, in this case, the mailing of the checks was an essential step integral to the completion or fruition of the scheme." *Id.* at 785–86.

In *United States v. Boyd,* 606 F.2d 792 (8th Cir.1979), the defendant, a director of two projects receiving federal grants, demanded that a consultant kick back a portion of his consulting fees. The mailings involved were grant requests sent by Boyd and by a state agency on behalf of his organizations. The court stated:

"One element of the continuing kickback scheme was the repeated financing of the various projects Boyd controlled. Continued receipt of grant monies which Boyd could pay out to [the consultant] as consulting fees was necessary to perpetuate and carry out this continuous scheme. Conduct is within the mail fraud statute when, as in this case, the use of the mails for the purpose of executing the flow of payoff funds is a reasonably foreseeable possibility in furthering the transaction, especially when the scheme continues and repeats over an extended period of time."

*Id.* at 794. Here, the mailings of invoices and warrants ensured that the vendors got paid, which was an essential part of the scheme. *See also United States v. Grande,* 620 F.2d 1026, 1029–30 (4th Cir.) (mailings of notice to proceed, payment, and bill relating to fraudulently obtained demolition contract), *cert. denied,* 449 U.S. 830, 919, 101 S.Ct. 98, 317, 66 L.Ed.2d 35, 146 (1980);

*United States v. Diggs,* 613 F.2d 988, 998–99 (D.C.Cir.1979) (mailing of congressional employees' paychecks, out of which defendant was paid kickbacks), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980). We conclude that the mailings at issue here are sufficient to bring the scheme within the mail fraud statute.

In this case, some invoices submitted by Craft included an affidavit of noncollusion, which is required by state law to be attached to all invoices in excess of $1,000. These mailings served the further purpose of preventing discovery of the scheme. In *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), the indictment alleged a scheme in which the defendants "purported to be able to help businessmen obtain loans or sell out their businesses." 371 U.S. at 77, 83 S.Ct. at 174. After the victims submitted their applications accompanied by application fees, the defendants allegedly mailed them "the accepted application together with a form letter . . . 'for the purpose of lulling said victims by representing that their applications had been accepted and that the defendants would therefore perform for said victims the valuable services which the defendants had falsely and fraudulently represented that they would perform.'" *Id.* at 78, 83 S.Ct. at 174 (quoting indictment). The district court dismissed the indictment, reasoning, on the authority of *Kann,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88, and *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), that no offense was charged because the mailings were after the defendants received their money and hence could not have been for the purpose of executing the scheme. The Supreme Court reversed, holding that subsequent mailings for the purpose of convincing the victims of the scheme that they had not been defrauded are " 'for the purpose of executing' a scheme within the meaning of the mail fraud statute." *Id.* 371 U.S. at 81, 83 S.Ct. at 176. *See also U.S. v. Curry,* 681 F.2d 406 (5th Cir.1982); *Sparrow v. United States,* 402 F.2d 826, 829 (10th Cir.1968) ("lulling" letter). The vendors' false affida-

vits in this case helped to conceal Primrose's kickback scheme.

Primrose cites *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), *Kann,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88, and *United States v. Wolf,* 561 F.2d 1376 (10th Cir.1977), in support of his argument that mailings after a defendant receives the fruits of a fraud are not for the purpose of executing the fraud. "*Kann* and *Maze* hold merely that under the facts of those cases the fraudulent schemes had ended before the mailings occurred. If the scheme continues, mailings made after receipt of the money can clearly support conviction." *U.S. v. Knight,* 607 F.2d 1172, 1175 (5th Cir.1979). *Wolf* is similarly distinguishable.

Finally, Primrose analogizes the mailings of invoices and warrants in this case to the mailings involved in *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). *Parr* concerned the misappropriation of a school district's funds by members of the school board, its secretary, its attorney, and certain bank officers. The mailings related to the assessment and collection of taxes, duties assigned to the school board by the state constitution and statutes. In the absence of any showing "that the taxes assessed and collected were excessive, 'padded' or in any way illegal," *id.* at 387, 80 S.Ct. at 1181, the Court concluded:

> "[I]t cannot be said that mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the federal mail fraud statute, even though some of those who are so required to do the mailing for the District plan to steal, when or after received, some indefinite part of its moneys."

*Id.* at 391, 80 S.Ct. at 1183. Primrose likens his situation to that in *Parr:*

> "Primrose was compelled by state law to purchase materials, supplies and equipment for his district. The Board of County Commissioners was compelled by state law to issue the warrants for payment of goods purchased for a county purpose. The warrants introduced at trial were not shown to have been padded or unlawful in any way, nor did the indict-

ment so allege. No such issue regarding padded invoices was submitted to the jury. Lastly, although the law did not compel the County Clerk to mail the warrants, the law obligated the County to issue warrants in payment of County obligations and in effect, caused the County Clerk to use the mails."

Brief of Appellant at 45.

Primrose's reliance on *Parr* is misplaced because it necessarily rests on his view of the vendors as outsiders rather than as the participants they were. If the scheme is properly viewed as including the vendors' receipt of county business as well as Primrose's receipt of kickbacks, the analogy to *Parr* breaks down. Primrose may have been legally required to purchase supplies, materials, and equipment, but he was not required to purchase them from vendors who paid him kickbacks. In fact he was required *not* to accept kickbacks. *See* Anti-Kickback Act of 1974, Okla.Stat. tit. 74, § 3404 (1981).

In sum, causing the mails to be used so that the county would pay the vendors who had paid kickbacks constitutes a violation of the mail fraud statute. The argument is even stronger in the case of the "50–50 splits" because a county commissioner's duties clearly do not include ordering goods that are not to be delivered. The warrants mailed to Klutts and the invoices mailed by Craft were each in furtherance of the fraud within the meaning of the mail fraud statute.

### V.

### OTHER ACT EVIDENCE

Primrose contends that the trial court should have excluded evidence of transactions not charged in the indictment because such evidence was "cumulative at best, and prejudicial at worst." Brief of Appellant at 37. He argues that this evidence was unnecessary to prove the existence of a scheme to defraud, which the Government should have been able to show by proving the thirty-eight charged counts. He asserts that evidence of forty-five kickbacks out-

side the five-year limitations period was highly prejudicial.

██ A trial court has broad discretion to determine whether the probative value of evidence outweighs the risk of prejudice. *See* Fed.R.Evid. 403;[7] *see also United States v. Franklin,* 704 F.2d 1183, 1187 (10th Cir.1983). Rule 404(b) of the Federal Rules of Evidence provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Under this Rule, the trial court admitted testimony and documentary evidence of Primrose's dealings with Wilson, a salesman and vendor, and some of his dealings with vendors Craft and Irwin.

██ In a factually similar case, involving an Arkansas road commissioner taking kickbacks, the Eighth Circuit upheld the admission of such evidence:

"The fact that a number of the overt acts performed in furtherance of the conspiracy were committed beyond the statute of limitations does not preclude the admission in evidence of such acts to show the nature of the scheme and [the commissioner's] intent when the later use of the mails occurred."

*United States v. Scott,* 668 F.2d 384, 387 (8th Cir.1981); *see also United States v. Adcock,* 558 F.2d 397 (8th Cir.), *cert. denied,* 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977).

We find these cases persuasive. The indictment here alleged the existence of a scheme for a period before the overt acts charged. The trial court did not abuse its discretion in admitting evidence of Primrose's other dealings. *See United States v. Lea,* 618 F.2d 426, 431–32 (7th Cir.) (testi-

mony that defendant solicited kickbacks from broker not in indictment), *cert. denied,* 449 U.S. 823, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980); *United States v. Reece,* 614 F.2d 1259, 1262 (10th Cir.1980) (evidence of defendants' kickback scheme with meat broker admissible in mail fraud trial for two similar schemes); *United States v. Walton,* 552 F.2d 1354, 1365 (10th Cir.) (evidence of sixth check in prosecution for interstate transportation of five stolen checks), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977); *but see United States v. O'Connor,* 580 F.2d 38, 42 (2d Cir.1978) (error to admit evidence that defendant meat inspector took bribes at three plants not charged in indictment).

The court instructed the jury to consider evidence concerning offenses and conduct not charged in the indictment "for the limited purpose or purposes of establishing intent, motive, knowledge, plan, [or] absence of mistake or accident ...." Rec., supp. vol. II, at 843. The court also gave a cautionary instruction each time such evidence was admitted. We find no abuse of discretion.

## VI.

## PROSECUTORIAL MISCONDUCT

### A. References to Other County Commissioners

The prosecutor briefly questioned four witnesses about Jimmy Frazier and Bird Lance, Jr., the two other commissioners for Murray County. Frazier had pled guilty and Lance had been found guilty of charges similar to Primrose's. Primrose asserts that these references were improper and prejudicial and denied him his right to a fair trial.

██ The first such references came during the redirect examination of Klutts. During cross-examination, Primrose's counsel had asked Klutts whether he "did busi-

---

**7.** Rule 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or

by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
Fed.R.Evid. 403.

ness with other county commissioners in Murray County after January of '78" (when he last did business with Primrose). *Id.,* supp. vol. I, at 348. The prosecutor then asked Klutts the names of these county commissioners and elicited testimony that he had paid kickbacks to Frazier and Lance. The trial court found that this was proper redirect because defense counsel had opened the door on cross. We find no abuse of discretion.

■ The three other references occurred during the prosecutor's cross-examination of defense witnesses. Clarence Knight, who had testified to Primrose's good reputation in the community for being an honest, law-abiding citizen, was asked about Frazier's and Lance's reputations. The court sustained defense counsel's objections when the prosecutor asked whether their reputations had changed recently. Otis Saunders also testified to Primrose's good reputation. During cross-examination, he said that his company also did business with Lance and Frazier and that they both had good reputations. Finally, Bobby Riddle, who had said that Primrose had a good reputation, was asked if his company did business with the other commissioners and what their reputations were. This time the court sustained defense counsel's objection and that line of questioning was stopped. From our examination of the record, we are convinced that any error was harmless. *See* Fed.R.Crim.P. 52(a).

### B. Cross-Examination on Primrose's Reputation

■ Primrose contends that the prosecutor improperly cross-examined three defense witnesses who had testified on direct examination as to Primrose's good reputation for honesty and integrity in the community.

The prosecutor asked each witness to speculate on what Primrose's community reputation would be if people knew he was guilty of taking kickbacks. In *United States v. Polsinelli,* 649 F.2d 793 (10th Cir. 1981), we held it improper for the Government to ask such questions because they are based on the assumption that the defendant is guilty of the very crimes for which he is being tried. *See also U.S. v. Candelaria-Gonzales,* 547 F.2d 291 (5th Cir.1977). In this case, however, no objection was made below to the questioning now raised as error. Accordingly, we may reverse on this ground only if it constitutes plain error affecting substantial rights. Fed.R.Crim.P. 52(b). In making this determination we must assess whether the verdict was substantially swayed by the error. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *United States v. Baez,* 703 F.2d 453, 455–56 (10th Cir.1983). In view of the abundant evidence of guilt in the record as a whole, we conclude that reversal is not required.

### C. Vouching for Witnesses

■ Primrose asserts that the prosecutor vouched for the Government's witnesses in his closing argument. This court has repeatedly condemned personalized vouching for the integrity of government witnesses. *See, e.g., United States v. Beckman,* 662 F.2d 661, 662 (10th Cir.1981); *United States v. Carleo,* 576 F.2d 846, 851–52 (10th Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 153, 58 L.Ed.2d 152 (1978); *United States v. Ludwig,* 508 F.2d 140, 143 (10th Cir.1974); *United States v. Martinez,* 487 F.2d 973, 977 (10th Cir.1973). Attorneys may not express their personal beliefs concerning the evidence or the witnesses. *United States v. Grapp,* 653 F.2d 189, 195 (5th Cir.1981).

■ It does not appear from our examination of the transcript, however, that the Government did in fact vouch for the integrity of its witnesses. In his closing argument, Primrose's counsel remarked:

"So, one of these desperate individuals turns your name into the Government and you are prosecuted and you come to hire me. And I say, well, I'll represent you but we've got a difficult time because someone is accusing you and here is what they are saying about you, they are saying just the two of you are alone together, no other evidence is available except the desperate person who accused you, his word against your word. How

are we going to defend it? What can we say?"

Rec., supp. vol. II, at 819. It was in response to that argument that the prosecutor made the remarks about which Primrose now complains:

"Mr. Stipe made a point that if someone accused you of taking a kickback what would have to be done. As the United States Attorney for eastern Oklahoma, ladies and gentlemen, I believe I can tell you in good faith that if there is only one person that came in and told the FBI that Jimmie Primrose took kickbacks from them, we wouldn't be here today. That isn't the case, and you know it."

*Id.* at 824. In context these remarks are little more than a reminder to the jury that it had heard more than one witness testify against Primrose. There was no improper vouching.

AFFIRMED.