**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James Louis WHITT, aka Jim Whitt,**
**Defendant-Appellant.**

No. 82–2213.

United States Court of Appeals,
Tenth Circuit.

Sept. 30, 1983.

Rehearing Denied Feb. 17, 1984.

Gene Stipe, Stipe, Gossett, Stipe, Harper, Estes, McCune & Parks, McAlester, Okl. (Anthony M. Laizure, McAlester, Okl., also on brief), for defendant-appellant.

Gary L. Richardson, U.S. Atty., Muskogee, Okl. (Scott Landon, Asst. U.S. Atty., Muskogee, Okl., also on brief), for plaintiff-appellee.

Before HOLLOWAY, McWILLIAMS and SEYMOUR, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant-appellant James Whitt brings this timely appeal from his conviction on thirty counts of mail fraud and three counts of extortion, 18 U.S.C. §§ 1341 and 1951 respectively. This prosecution was one of many that resulted from an extensive investigation by the F.B.I., the I.R.S., and the United States Attorneys for Oklahoma. The focus of the investigation was the payment to some county commissioners of kickbacks, *i.e.,* bribes, by vendors of equipment and supplies purchased by the counties for road construction, bridge repair, etc.

Defendant Whitt was a county commissioner in Seminole County, Oklahoma. He was charged under the mail fraud statute, 18 U.S.C. § 1341 (and 18 U.S.C. § 2, punishing, as principals, aidors and abettors and those causing an offense to be committed by another person), with defrauding the citizens of Seminole County of their right to have county government conducted honestly and impartially, and with using the mails in furtherance of the kickback scheme. *See, e.g., United States v. Mandel,* 591 F.2d 1347, 1362 (4th Cir.1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). Additionally defendant Whitt was charged with extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, based on his obtaining the kickbacks "under color of official right," allegedly obstructing or affecting interstate commerce. *See, e.g., United States v. Hall,* 536 F.2d 313, 320 (10th Cir. 1976), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976).

The government's witnesses at trial included several vendors who said they had made illegal payments to Whitt. Each of these witnesses had made an agreement with the United States Attorney to testify in exchange for being allowed to plead guilty to one count of conspiracy to commit

mail fraud and to evade taxes, which count was to include all transactions for which the individual could have been charged.[1]

In his defense, Whitt called several witnesses who testified to his good reputation in the community. Several vendors who had dealt with Whitt testified that they had never made payments to Whitt and that he had never requested any kickbacks. A former I.R.S. agent testified that he had studied Whitt's tax returns for the years in question, along with other financial records provided by Whitt, and had found no evidence of unreported income. Finally, Whitt testified in his own defense, denying that he had ever solicited or accepted kickbacks.

On appeal, Whitt claims there was reversible error in that (1) the *voir dire* examination of prospective jurors by the trial court was not adequate to assess the jurors' impartiality in view of the voluminous publicity generated by the county commissioner scandal, and the trial judge failed to question the jurors individually, outside the presence of the other jurors; (2) the routine mailings of county warrants were not made in execution of the alleged scheme to defraud so as to establish a mail fraud case; (3) the evidence on the extortion counts was not sufficient to establish the connection with interstate commerce required by the Hobbs Act; and (4) the trial court erred in instructing the jury on the depletion of assets theory which was not alleged in the indictment. We now consider Whitt's arguments for reversal.

I

*The voir dire*

Defendant-appellant Whitt asserts that there was reversible error in connection with the *voir dire*. He contends that the extent of the court's *voir dire* of the prospective jurors was inadequate to test the jurors for impartiality in light of the exten-

sive pretrial publicity concerning the county commissioners in the State of Oklahoma.

Whitt notes that all but one juror had read or heard something about the ongoing county commissioner investigations and claims that the trial court had a duty to inquire into "the sources, nature and extent of the information each juror had been exposed to" in order to ascertain the impact of the publicity. (Brief of Appellant at 17). Whitt says that the *voir dire* was so limited that the trial court could not objectively assess the impact of the pretrial publicity on the jurors and thus could not determine whether or not it affected their partiality. Whitt relies heavily on *Silverthorne v. United States,* 400 F.2d 627 (9th Cir.1968), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633, where the court stated "that in the absence of an examination designed to elicit answers which provide an objective basis for the court's evaluation, 'merely going through the form of obtaining jurors' assurances of impartiality is insufficient [to test that impartiality].'" *Id.* at 638 (quoting *United States v. Denno,* 313 F.2d 364, 379 (2d Cir.1963), *cert. denied,* 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143).

Although Whitt lodged a timely request that defense and government counsel be permitted to conduct the *voir dire* of the jury (I R. 19), the trial court conducted the *voir dire* itself as authorized by Rule 24(a) F.R.Crim.P.[2] And it has generally been the practice in this circuit for the court to ask the questions. *United States v. Grismore,* 546 F.2d 844, 848 (10th Cir.1976); *United States v. Hall,* 536 F.2d 313, 324 (10th Cir. 1976), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285. The purpose of the *voir dire* procedure is to enable the parties to obtain an impartial jury, *Brown v. New Jersey,* 175 U.S. 172, 175, 20 S.Ct. 77, 78, 44 L.Ed. 119 (1899); *United States v. Craw-*

---

1. One witness was required to plead to two counts.

2. Rule 24(a) F.R.Crim.P. provides:

    Examination. The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself con-

duct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper.

*ford,* 444 F.2d 1404, 1405 (10th Cir.1971), and it achieves that purpose by laying "the predicate for both the judge's and counsel's judgment about the qualifications and impartiality of potential jurors. Without an adequate foundation, counsel cannot exercise sensitive and intelligent peremptory challenges, that suitable and necessary means of ensuring that juries be in fact and in the opinion of the parties fair and impartial." *United States v. Baker,* 638 F.2d 198, 200 (10th Cir.1980).

■■■ Where there is the possibility or likelihood that potential jurors have been exposed to prejudicial publicity, they must be questioned with special care so as to insure that such publicity did not result in bias.[3] *United States v. Hall, supra,* 536 F.2d at 324; *Silverthorne v. United States,* 400 F.2d 627, 637–38 (9th Cir.1968), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633; 8A Moore's Federal Practice, ¶ 24.03 (1982). Our canvass of the record in this regard is limited by the principle that *voir dire* is within the sound discretion of the trial court, *Ristaino v. Ross,* 424 U.S. 589, 594–95, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976), and the court's exercise of that discretion will not be disturbed, absent a clear showing of abuse. *United States v. Polk,* 550 F.2d 1265, 1267 (10th Cir.1977), *cert. denied,* 434 U.S. 838, 98 S.Ct. 129, 54 L.Ed.2d 100; *United States v. DePugh,* 452 F.2d 915, 921 (10th Cir.1971), *cert. denied,* 407 U.S. 920, 92 S.Ct. 2452, 32 L.Ed.2d 805.

Here the trial court asked numerous questions of the jury array. Before the panel of twenty-eight prospective jurors was chosen, the court asked the entire venire if any of them had heard or read of this particular case, three prospective jurors indicated that they had, and, after further questioning of those three, the court excused one of them because he had already formed an opinion as to the guilt or innocence of the defendant. (*Voir Dire* R. 7–8). The other two indicated that they had not formed an opinion as a result of hearing or reading about the case. The court also asked if anyone had *not* heard of the case, if anyone was personally acquainted with counsel or the defendant, and whether there was any reason why they may not be fair and impartial to both sides in the case. (*Voir Dire* R. 8–13).

A panel of twenty-eight potential jurors was then seated and, at the outset, the court determined that all but two of the twenty-eight had heard or read of the general investigation into county commissioner practices. (*Voir Dire* R. 18–19). The court then asked whether any of the commissioners in the jurors' respective counties had been charged in connection with the investigation, seven responded affirmatively, and the court proceeded to press those seven as to whether that might influence them in any way. As a result of this questioning, the trial judge asked one potential juror to step down because she responded indecisively to his questions, the judge concluding that she "may have trouble putting out the decision in another case from [her] mind." (*Voir Dire* R. 20).[4]

The court also asked the panel general questions propounded in most cases. The potential jurors were asked if they, or members of their immediate families, were ever county employees or involved in law enforcement and numerous individuals were questioned about their professions. Those working in sales or as purchasing agents were sought out and questioned as to whether or not they had ever been involved in the type of business transaction alleged in the instant case and the witness lists of the prosecution and defense were read aloud to determine if anyone on the panel

---

**3.** There are, of course, numerous instances, other than through pretrial publicity, where the prejudices of prospective jurors may be aroused and the trial court should tend to be especially probing during *voir dire. See, e.g., Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 850, 35 L.Ed.2d 46 (1973) (racial prejudice); *United States v. Baker, supra,* 638 F.2d at n. 2.

**4.** Only six of the original twenty-eight panel members indicated that their county commissioner was charged in connection with the investigation. However a county commissioner of the replacement for the woman excused by the court was also involved in the investigation, thus accounting for the seventh panel member questioned in this regard. (*Voir Dire* R. 21–22).

was acquainted with any of the witnesses. The court also asked, at the lawyers' request, whether any of the panel served as jurors in another county commissioner prosecution and those who had were further questioned as to whether the prior case had made an influence on them. (*Voir Dire* R. 39–41). Finally, before asking counsel if they had supplemental questions, the court asked the panel the following (*id.* at 43):

Now, I have asked many questions, Ladies and Gentlemen, and maybe there are some that I should have asked that I haven't, but I'm going to ask now for the bottom line question, and then I'm going to call the lawyers up here. *Do any of you, any one of the twenty-eight of you, know of any reason at all that's known to you and unknown to me and unknown to the lawyers and litigants why you could not be a fair and impartial juror in this case?*

(Emphasis added). None of the panel responded.

Counsel were then asked to approach the bench to inform the court if they had further questions they wished the court to ask of the jury. As a result, the court asked two additional general questions.[5] We note that, judging from the substance of the last supplemental question, it seems that it was suggested by defense counsel, yet it did not touch on pretrial publicity in any way.[6]

Though the trial court's *voir dire* questions were not as probing or as detailed as Whitt desired, we find no abuse of discretion or prejudicial error. In *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), a case of extreme prejudicial pretrial publicity about a defendant charged in six murders, the Court said (*id.* at 722–23, 81 S.Ct. at 1642):

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (Citations omitted).

We do not feel that the tenor of the pretrial publicity shown by the record in this case was such that the care demonstrated by the trial court was inadequate. "[S]imply because a prospective juror admits having read newspaper accounts relative to a criminal charge is not in itself sufficient grounds for excusing a juror." *United States v. Lamb,* 575 F.2d 1310, 1315 (10th Cir.1978), *cert. denied,* 439 U.S. 854, 99 S.Ct. 165, 58 L.Ed.2d 160. We have reviewed the numerous newspaper exhibits relied on by Whitt from a companion case, *United States v. Boston,* 718 F.2d 1511 (10th Cir.1983), decided today. We note that none of the articles explicitly deals with Whitt. Indeed, several of them indicate that many county commissioners were *not* involved in the kickback scandal.

Thus we feel there is a distinction between the instant case and *Silverthorne v. United States,* 400 F.2d 627 (9th Cir.1968),

---

5. The questions were (*Voir Dire* R. 44):
    Do any of you have any such close personal friendship with your own county commissioner or any other county commissioner in this state that may bias you in favor of county commissioners as a whole? None of you do. Thank you.
        *   *   *   *   *   *
    Do any of you feel that your own county commissioner has not done a good job; that

they don't come out and grade the roads and keep them in proper order so you can get to your farm or your home or whatever? Just done a bum job generally, and you think they're all bad. Any of you fall into that category? None of you do.

6. All challenges were exercised off of the record. (*Voir Dire* R. 47).

*cert. denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633, on which Whitt relies, where the defendant alone was subject to massive and often virulent publicity prior to trial.[7] Here, the news reporting was not specifically focused on Whitt, nor malicious. *See United States v. DePugh,* 452 F.2d 915, 921 (10th Cir.1971), *cert. denied,* 407 U.S. 920, 92 S.Ct. 2452, 32 L.Ed.2d 805. All of the jurors that remained on the panel responded that, although they may have read or heard of the county commissioner probe or this case, they did not have an opinion either way—and those with pre-formed opinions were excused by the court. *See United States v. Hall, supra,* 536 F.2d at 325 & n. 9. We conclude that the *voir dire* conducted by the court to test the jurors' impartiality was not an abuse of discretion and that the nature of the publicity here did not mandate greater care than was taken so as to insure impartiality.

■ Whitt further objects to the *voir dire* because the trial court refused to individually question prospective jurors outside the presence of other jurors. The court denied Whitt's request for individual *voir dire,* citing the time and effort such a procedure would entail. As noted, the trial court is granted broad discretion in the conduct of *voir dire* and its exercise of that discretion will not be reversed, absent a clear showing of abuse. In view of our conclusions as to the nature of the pretrial publicity here we find no abuse of discretion in the trial court's denial of Whitt's request that *voir dire* be conducted in such a manner.

In sum, we are not persuaded that there was error in the conduct of the *voir dire* of the jury.

## II

■ Whitt next contends that the mailings of the warrants were not an integral part of the kickback scheme and, therefore,

that the scheme does not fall within the purview of the federal mail fraud statute.

Whitt offers three rationales for his argument. First he says that the use of the mails was not a step toward receipt of the fruits of the scheme. This premise is said to be especially true with respect to those transactions in which the kickback was paid before the vendor received the county's warrant. One vendor, Klutts, testified that he usually paid his kickbacks "up front," when an order was placed, instead of waiting until the warrant was received from the county. Tr. 158–59. In addition, several of the transactions at issue were lease-purchase transactions instead of direct purchases. In a lease-purchase transaction the county would lease equipment from the vendor with an option to purchase the equipment at the end of the lease. The vendor would assign its rights under the lease to a local bank. The vendor would pay the kickback to Whitt and the county would make monthly payments to the bank.

Whitt's second theory to support this proposition is related to the first. He contends that the government's failure to prove the sequence of the other transactions, *i.e.,* the failure to prove that the kickbacks were paid after the warrants were received, results in failure to establish that the mailings were in furtherance of the fraudulent scheme. Third Whitt argues that the mailings were, in effect, compelled by state law and that, in light of *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), such mailings cannot be the basis for conviction under § 1341.

We need not discuss these arguments in detail as we have considered and rejected similar contentions in other opinions filed this date. *See United States v. Primrose,* 718 F.2d 1484 (10th Cir.1983), and *United States v. Gann,* 718 F.2d 1502 (10th Cir. 1983). In *Primrose* we concluded that the mailings of warrants were integral to the

---

7. Silverthorne, the president and principal organizer of the San Francisco National Bank, was charged with misapplication of massive amounts of the Bank's funds (approximately $30,000,000) and false entries in bank records. When the bank was closed because of insolven-cy, "the San Francisco Bay Area newspapers were saturated with more than 300 articles concerning Silverthorne and the alleged reasons for the closing of the bank. Radio and television coverage was likewise extensive." *Silverthorne, supra,* 400 F.2d at 631.

overall scheme, regardless of whether the illegal kickback payment was made before or after the mailing, at 1488–1489, and we distinguished the kickback scheme from the misappropriation of school revenues in *Parr,* at 1501. In *Gann* we held that the lease purchase transactions were properly within the purview of the mail fraud statute. At 1497. On the reasoning in those opinions we conclude that Whitt's arguments are without merit.

### III

As to Whitt's contention that the evidence on the extortion counts failed to establish the effect on commerce required under the Hobbs Act, we again are guided by our opinion of this date in another case arising from the county commissioner investigation, *United States v. Boston,* 718 F.2d 1511 (10th Cir.1983). In *Boston,* we held that a *de minimis* effect on commerce would sustain federal jurisdiction under § 1951.

■ The instruction given in the instant case differs somewhat from that given in *Boston,* where the jury was told that one element of a Hobbs Act violation was that the defendant "actually *or potentially* obstructed, delayed or affected commerce." Here the court instructed that the prosecution was required to prove "that the natural consequences of the acts alleged ... would be to delay, interrupt or adversely affect" commerce. As in *Boston,* the jurors were further told that the government could carry its burden of proof on this element by any of the following three showings: (1) that the vendor was engaged in commerce and that depletion of the vendor's assets would be the natural consequence of the alleged extortion; (2) that Seminole County was engaged in commerce and that depletion of its assets would be a natural consequence of the alleged extortion; or (3) that the vendor purchased supplies from outside the State of Oklahoma which were then brought into the State and delivered to Seminole County as a result of the alleged extortion. Based on our holding in *Boston* we find no error in this instruction. We do not agree with Whitt's assertion that the evidence was insufficient.

■ Whitt argues that the testimony of one vendor, Klutts, gave no indication at all that he was engaged in interstate commerce. Although this observation is correct, it does not support Whitt's position that the conviction on this count should be reversed. Klutts did testify that he charged the county higher prices because of the kickback scheme. Tr. 127, 176–77. Other trial testimony indicated that Seminole County regularly purchased goods that had moved in interstate commerce. Therefore on the second ground outlined above, there was sufficient evidence for the jury to make the required finding to support the conviction on this count.

The vendors who were the victims in the other two extortion counts, Litton and Bucklin, testified that they made purchases from other states. Litton testified that some of the products he sold came from other states. Bucklin testified that machinery his company sold was manufactured outside of Oklahoma. Tr. 184, 280. Whitt says the evidence of an interstate nexus is "almost non-existent." We disagree and find the evidence sufficient to support the convictions.

Whitt relies on two cases from other circuits for the proposition that the evidence must establish that the extortion victim "customarily" obtained goods through interstate commerce. *United States v. Elders,* 569 F.2d 1020 (7th Cir.1978); *United States v. Merolla,* 523 F.2d 51 (2d Cir.1975). We are not persuaded that the cases call for reversal here.

In *Elders* the evidence conclusively established that the victim had ceased purchasing goods from outside the State before the extortion and went out of business shortly after the extortion. Even on those facts the reversal of the conviction prompted a vigorous dissent. 569 F.2d at 1026–27 (Bauer, J., dissenting). Here there was no comparable evidence that any extortion victim had ceased to make interstate purchases. *Merolla* is similarly unhelpful to Whitt. There the victim was a construction company that was formed solely to perform the

one contract involved in the indictment. These cases are readily distinguishable from the instant case. Here the evidence indicated the victims (whether the victim is seen as the county or the vendor) were engaged in commerce on a continuing basis.

Accordingly we conclude that the evidence was sufficient to support the Hobbs Act convictions.

### IV

■ Whitt argues further that the court erred in instructing the jury on the depletion of assets theory (see Part III) as a method of establishing the requisite effect on commerce under the Hobbs Act. He does not contend that the theory is itself spurious. Rather, his claim is that the failure to include the theory in the indictment prejudiced him and that instructing on the theory when it was not charged in the indictment constituted an amendment of the indictment in violation of his Fifth Amendment rights. We considered and rejected this argument in *Boston*. For the reasons stated there (at 1515), we find that this proposition is without merit.

### V

■ Whitt submitted one final contention which was allowed to be briefed by special order of the court. Whitt claims error in the trial court's refusal to permit him to introduce evidence that a government witness, McKiddy, had failed a polygraph examination. Whitt does not seek to overturn the general rule that polygraph examination results are inadmissible. Instead, he argues that special circumstances present here required the admission of the proof as an exception to that rule.

McKiddy was a vendor who testified that he had paid kickbacks to Whitt. Because none of these transactions were within the statute of limitations, McKiddy's testimony was used to establish a scheme or plan rather than as direct evidence of the kickback and mailings on any particular count.

See *United States v. Blosser*, 440 F.2d 697, 699 (10th. Cir.1971). McKiddy, like other vendors who testified, had agreed to cooperate with the United States Attorney in the prosecution of county commissioner cases, in exchange for a promise to have only one count against him presented to a grand jury. As part of this agreement each witness had consented to submit to a polygraph examination if requested to do so.

Whitt says that he should have been allowed to cross-examine on the results of that polygraph and to disclose them to the jury because the prosecution opened the door by offering the plea agreement in evidence on direct examination of McKiddy. Whitt contends that the court's refusal to permit this violated his Sixth Amendment right to confront witnesses, which is paramount, citing *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). He further argues that his due process rights were violated when, after this adverse ruling, the prosecutor was allowed to comment, over objections, in closing argument that the government witnesses were not likely to have been motivated to lie to the investigators because they were subject to polygraph testing. The trial court said that there was a difference in the use made of the point in argument in that the plea agreement "speaks of the obligation of the party to take the polygraph test, though." Tr. 438.

We are not persuaded that reversible error occurred. We do agree that an unfairness resulted when the government referred, during argument, to the provision on polygraphs in the plea agreement, after objecting and preventing reference to the results or their admission in evidence. We are convinced nevertheless that any error committed by the trial court in connection with these rulings was harmless. McKiddy's testimony was not crucial to proof of the kickbacks in question, being instead evidence of other kickbacks paid to Whitt as proof of the scheme alleged.[8] The poly-

---

8. Whitt relies primarily on *United States v. Hart*, 344 F.Supp. 522 (E.D.N.Y.1971), in which polygraph results were held admissible under special circumstances. In *Hart* the prosecution knew that its principal witness had failed a

polygraph examination. During cross-examination the witness had blurted out that he had taken the test. The court said the case should be considered primarily in light of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10

graph results show that the responses indicative of deception were made to questions that did not involve the defendant's receipt of the kickbacks charged.[9] While the results might have been useful to impeach the witness, the matters involved were not of serious importance in the case. In the circumstances any error was harmless.

### VI

In sum, the defendant appellant has not demonstrated any reversible error in the record of his trial. Accordingly the judgment is

AFFIRMED.

L.Ed.2d 215 (1963); that the defendant was entitled to inquire concerning investigations which might put the government on notice that a government witness was untruthful, citing *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); and that the test results were admissible on behalf of the defendant because the government initially thought they were reliable enough to assist it in evaluating its witness, although this did not constitute any reason for changing the general rule against admission of such evidence.

However, here the witness McKiddy was not a crucial one and the falsehoods indicated did not concern the defendant's conduct. While the *Hart* case is convincing, we do not feel that it calls for reversal here.

9. The polygraph results are in the record, having been admitted as *in camera* exhibits, and defense counsel was permitted to examine them during cross-examination of McKiddy.