**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William T. BOSTON, Defendant-Appellant.**

No. 82–1323.

United States Court of Appeals, Tenth Circuit.

Sept. 30, 1983.

Rehearing Denied Feb. 17, 1984.

Before HOLLOWAY, McWILLIAMS and SEYMOUR, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant-appellant William T. Boston brings this timely appeal from his conviction on seven counts of extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and forty-seven counts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2.[1] The charges against Boston alleged that he engaged in a practice of taking "kickbacks," i.e., bribes, from sellers of equipment and supplies that Boston purchased in his capacity as County Commissioner of Major County, Oklahoma. Both the extortion and the mail fraud charges were based directly on Boston's acceptance of kickbacks. The extortion counts accused Boston of using his office to extract payments from seven different suppliers. The various mail fraud counts alleged that the mails were used in individual purchases from the seven suppliers for which kickbacks were paid.

Boston's indictment was part of a comprehensive effort by the F.B.I., the I.R.S. and the United States Attorneys for Oklahoma to eliminate alleged corruption in purchasing practices of county commissioners throughout Oklahoma. The Hobbs Act counts were based on charges of obtaining money "under color of official right." See United States v. Hall, 536 F.2d 313, 320 (10th Cir.), cert. denied, 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976). The mail fraud counts were premised on allegations of defendant's having defrauded the citizens of the County of their right to have the County's business conducted honestly and impartially. See United States v. Mandel, 591 F.2d 1347, 1362 (4th Cir.1979), cert. denied, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980).

Each of the seven suppliers testified at the trial after having made an agreement with the government to cooperate in the investigation and subsequent prosecutions. In exchange the government agreed to per-

Gene Stipe of Stipe, Gossett, Stipe, Harper & Estes, McAlester, Okl. (Anthony M. Laizure, McAlester, Okl., also on brief), for defendant-appellant.

Susie Pritchett, Asst. U.S. Atty., Oklahoma City, Okl. (William S. Price, U.S. Atty., Oklahoma City, Okl., also on brief), for plaintiff-appellee.

1. Boston was originally charged with fifty counts of mail fraud. Two counts were dis-

missed before trial, and the District Court dismissed one count after trial.

mit the seven witnesses to plead guilty to one count of conspiracy to commit mail fraud and to evade taxes. In each case the single conspiracy count was to cover all kickback transactions, so the suppliers were relieved of the threat of numerous prosecutions based on their individual transactions.

In general, the suppliers testified that they paid kickbacks because they did not think they had a chance to compete for contracts with the commissioners if they did not. On some occasions the amount of the kickback would be negotiated before the sale. Frequently, especially when the supplier had dealt with a commissioner before, there would be a tacit understanding that a kickback in an amount equal to a certain percentage (ranging from five to fifteen per cent) would be forthcoming. Boston participated in transactions following both of these patterns. Some suppliers initiated the bribes because they believed it necessary to do so, but others said they paid a kickback only when the county official involved asked for it.

The actual payment of the kickback always occurred after the purchase had been completed and the payment therefor was made. Payments were made by warrants, *i.e.,* drafts or checks, which were mailed to the vendors. At some convenient time after receiving the county's payment the supplier would meet privately with Boston and pay the kickback in cash. The bribes were often paid while Boston and the supplier were alone in a car; frequently trips to road construction sites and other locations were made in order to make the payoff in the seclusion of the car on a country road.

In his defense Boston offered the testimony of several witnesses who described his excellent reputation in the community, and that of several vendors who had dealt with Boston and who testified that Boston had never solicited or accepted kickbacks from them. A former I.R.S. agent testified that he had examined Boston's tax returns and other financial papers and had found no evidence of unreported income. Boston also testified himself, denying that he had ever accepted any kickbacks.

For reversal, defendant Boston claims error in that: (1) the trial court erroneously instructed the jury on a depletion of assets theory which was not charged in the indictment; (2) the evidence on the extortion counts failed to establish the nexus with interstate commerce required by the Hobbs Act; (3) the trial court's *voir dire* was inadequate to test the jurors' impartiality in light of the massive, inflammatory pretrial publicity, and the court erred in not individually questioning each juror; and (4) the routine mailings of county warrants, made or caused to be made under a duty imposed by state law, were not in execution of the alleged scheme to defraud.

I

On the extortion counts under the Hobbs Act, the government offered testimonial evidence that Boston's demands for kickbacks reduced the assets available to the vendors or to Major County. The court then instructed the jury that such evidence could support a finding of an effect on interstate commerce, a necessary element of an offense under the Hobbs Act.[2] Boston now contends that the trial court erred in giving this instruction, arguing that the instruction broadened the charges against him, thus constituting an improper amendment of the indictment.

---

**2.** The Hobbs Act provides, in pertinent part:
  (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

  (b) As used in this section—
    \*    \*    \*    \*    \*    \*
  (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
18 U.S.C. § 1951 (1976).
  The instructions presented the jury with three alternative grounds for finding the required effect on commerce. See Part II, *infra*.

Boston relies on *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), in which the Supreme Court reversed a conviction under the Hobbs Act because the prosecution was allowed to show, and the jury was instructed concerning, an effect on commerce different from the specific obstruction of commerce alleged in the indictment. The indictment had charged that Stirone used his influence as a labor union official to extort money from Rider, who supplied concrete for the construction of a steel-processing plant in Pennsylvania. The indictment specifically referred to Rider's importation of sand into Pennsylvania for use in his concrete business. At trial, however, the government, over Stirone's objection, offered evidence that commerce was affected because the steel plant would ship its product interstate. The jury was instructed, again over Stirone's objection, that the requisite connection with interstate commerce could be established either by a finding that Rider used sand that was brought into Pennsylvania from another state or by a finding that Rider's concrete was used to construct the mill which would manufacture steel goods to be shipped in interstate commerce. The Court held that this variance between the indictment and the proof required reversal of the conviction because "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." 361 U.S. at 217, 80 S.Ct. at 273.

Boston's reliance on *Stirone* is misplaced. There the Court observed:

> [W]hen only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened.

361 U.S. at 218, 80 S.Ct. at 273. We think it clear that in the instant case the indictment was drawn in general terms so that the contention that the indictment was, in effect, amended is erroneous. We are convinced that the indictment charging the Hobbs Act offenses was not defective and that there was no variance in the proof or instructions so that Boston's convictions under the Act might rest on charges not made by the grand jury, in violation of his Fifth Amendment right to indictment by grand jury. *See Stirone, supra; Russell v. United States,* 369 U.S. 749, 770–71, 82 S.Ct. 1038, 1050–51, 8 L.Ed.2d 240 (1962); *United States v. Radetsky,* 535 F.2d 556, 562 (10th Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976).

▉ The indictment must inform the accused of the nature of the crime charged and its basis so that he may prepare his defense and it must protect the accused against subsequent prosecution for the same offense. *See United States v. Herbst,* 565 F.2d 638, 643 (10th Cir.1977). Boston does not claim that the indictment here was inadequate for the latter purpose, nor could such an argument fairly be made. The record clearly identifies the transactions on which the convictions are based, and the entire record, not just the indictment, may be referred to in order to protect against double jeopardy if a subsequent prosecution should occur. *United States v. Levine,* 457 F.2d 1186, 1189 (10th Cir.1972).

▉ Nor was the indictment defective for failure to allege the essential elements of offenses under the Hobbs Act. We are persuaded that it is not necessary for the indictment in a Hobbs Act case to allege the exact nature of the interference with commerce. *See Carbo v. United States,* 314 F.2d 718, 732–33 (9th Cir.1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964); *United States v. Barna,* 442 F.Supp. 1232 (M.D.Pa.), *aff'd mem.* 578 F.2d 1376 (3d Cir.), *cert. denied,* 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed.2d 172 (1978); *United States v. Frumento,* 405 F.Supp. 23, 30 (E.D.Pa.1975), *aff'd mem.* 559 F.2d 1209 (3d Cir.1977); *United States v. Quinn,* 364 F.Supp. 432, 437–38 (N.D.Ga.1973); *United States v. Malinsky,* 19 F.R.D. 426, 427–28 (S.D.N.Y. 1956). The general allegations that defendant knowingly, willfully, and unlawfully attempted "to obstruct, delay or effect (sic) commerce and the movement of articles and commodities in commerce, as the term commerce is defined in [the Hobbs Act] by

extortion," IR. 1–2, were sufficient. Under the general allegations made in the indictment, the evidence advanced and the issues submitted to the trial jury were not a fatal variance as in *Stirone.*

■ We also believe that Boston had ample notice from the indictment of the acts for which he was to be tried. *See United States v. Tomasetta,* 429 F.2d 978, 979 (1st Cir.1970) ("question is whether the indictment as a whole conveys sufficient information to properly identify the conduct relied upon by the grand jury in preferring the charge"). The convictions were not based on facts outside the scope of the indictment as was the case in *Stirone. United States v. Hyde,* 448 F.2d 815, 838–39 (5th Cir.1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972).

We conclude, therefore, that the instant case is distinguishable from *Stirone* and that defendant Boston's rights were not infringed as he claims.

## II

Boston next argues that the government's evidence failed to establish sufficient interference with interstate commerce to constitute a violation of the Hobbs Act. Authorities are not presented to support the argument and we find it unpersuasive.

■ The language of the Hobbs Act specifically proscribes interference *"in any* way or *degree* ... by robbery or extortion." 18 U.S.C. § 1951(a) (1976) (emphasis added). As the Supreme Court observed in *Stirone,* "[the Hobbs] Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion ...." 361 U.S. at 212. Although this is apparently the first time the issue has been before this court, several other circuits have held that the clear language of the Act makes any *de minimis* effect on commerce sufficient to sustain federal jurisdiction. *See, e.g., United States v. Glynn,* 627 F.2d 39, 41 (7th Cir. 1980); *United States v. Harding,* 563 F.2d 299, 301–302 (6th Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978). The circuits also are in agreement

that evidence of depletion of assets may establish the requisite effect on commerce. *See, e.g., United States v. Boulahanis,* 677 F.2d 586, 589–90 (7th Cir.) (citing cases) *cert. denied,* —— U.S. ——, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982); *United States v. Zemek,* 634 F.2d 1159, 1173 n. 20 (9th Cir. 1980), *cert. denied,* 450 U.S. 916, 985, 101 S.Ct. 1359, 1525, 67 L.Ed.2d 341, 821, 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981); *United States v. French,* 628 F.2d 1069, 1075–78 (8th Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980); *United States v. Daley,* 564 F.2d 645, 649–50 & n. 4 (2d Cir.1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978). We agree with these interpretations of the Hobbs Act.

■ In the instant case the jury was instructed that the government was required to prove that Boston "actually or potentially obstructed, delayed or affected interstate commerce or attempted to do so." I R. 263. With respect to this element of the offense, the court further said that (I R. 264):

> you are instructed that while it is not necessary to prove that the defendant specifically intended to interfere with interstate commerce, or attempted to do so, it is necessary as to this issue that the government prove that the natural consequences of the acts or attempted acts alleged in the indictment would be to delay, interrupt or affect "interstate commerce," which means the flow of commerce or business activities between two or more States.

The district court then informed the jurors that they could find that the government had met its burden of proof on this element if it had proved any of the following: (1) that the vendor was engaged in interstate commerce and depletion of the vendor's assets would be the natural consequence of the alleged extortion; (2) that Major County was engaged in interstate commerce and that a depletion of its assets would be a natural consequence of the alleged extortion; or (3) that the vendor purchased supplies from outside the State of

Oklahoma which were then brought into the State and delivered to Major County as a result of the alleged extortion. I R. 264–65.

We find no error in the charge with respect to the alternative theories for finding obstruction of commerce. And under the standard required by the trial judge, the government's evidence was sufficient.

The trial transcript first reveals that as to each extortion count except Count 48 the government showed that the victim sold materials that had moved in interstate commerce. This was established as to Counts 16, 50, 52 and 54 by the testimony of the vendors (*see* Tr. 230, 407, 376, 491), who were, respectively, McReynolds, Dudley Williams, Hicks and Davis. Allred, who made the payment charged in Count I, obtained supplies from two Oklahoma companies. Employees of these suppliers testified that their goods originated outside Oklahoma. Tr. 279–80 (testimony of Donna Shelby), 287–88 (testimony of Harold Huffman). A fellow employee of salesman Detrick, the vendor in Count 29, testified that that company, Thurman Bridge & Block Company, obtained most of its goods from out-of-state sources.

From this evidence the jury could find that the government had satisfied its evidentiary burden by way of the first alternative presented in the instruction if the jury also concluded that depletion of the victim's assets was a natural consequence of the extortion. Such a conclusion can be drawn from the evidence as a whole, and with respect to Counts 1, 16, 29, 52 and 54, there was explicit testimony that such depletion had occurred. Tr. 138, 227, 301, 376, 484. The failure to offer such explicit evidence on Count 50 is of no consequence since the jury easily would have been justified in drawing this conclusion. This leaves only Count 48. As to this count, there was direct evidence that the county's assets were depleted by the kickback. Tr. 445. There is ample evidence that Major County was involved in interstate commerce, purchasing substantial amounts of goods that originated outside Oklahoma. Therefore, under the second option presented by the instruc-tion, the jury's finding is clearly supported by the evidence.

In sum, the evidence of the required effect on commerce was sufficient to sustain the verdicts under the instructions.

### III

We next consider Boston's contentions that the *voir dire* examination conducted by the trial court was inadequate and that the judge erred in not individually questioning the prospective jurors outside the presence of the jurors.

We have studied the record carefully and find that the circumstances here are similar to those in *United States v. Whitt,* 718 F.2d 1494 (10th Cir.1983), filed this date. Most of the pretrial publicity, like that in *Whitt,* concerned the county commissioner scandal in general, although a number of jurors had read articles or parts of them discussing defendant Boston himself. The same judge presided over the Whitt trial and the instant case, and his *voir dire* procedure in the two cases was similar. He followed a comparable pattern of asking general questions regarding the potential jurors' exposure to pretrial publicity, followed by individual questions to jurors whose responses aroused concern, and he also asked basic questions propounded in most cases such as possible acquaintance with parties or their counsel. On the basic reasoning and authorities set out in *Whitt,* we conclude that there was no reversible error in the conduct of the *voir dire* in defendant Boston's trial.

### IV

Our analysis of defendant Boston's remaining argument is similarly guided by our decision this date in another case arising from the investigation of the Oklahoma county commissioners. Defendant Boston argues that the use of the mails in the kickback scheme was not integral to the operation of the plan and so was not sufficient to invoke federal jurisdiction under 18 U.S.C. § 1341. We considered similar contentions in *United States v. Primrose,* 718 F.2d 1484 (10th Cir.1983), filed this date.

On the facts in that case we concluded that the use of the mails was sufficient to bring the case within the purview of § 1341.

In the instant case the government has relied solely on the mailing of the county warrants to the vendors to bring the scheme within the reach of the federal statutes, while in *Primrose* some counts were based on the mailing of warrants and some on the mailing of invoices. *Primrose* also included proof that some invoices were mailed with "no kick-back" affidavits attached. Here we reach the same conclusion as in *Primrose,* based on the proof of the mailing of warrants.

While in *Primrose* the evidence was that kickbacks usually were paid before the warrants were mailed, the opposite was the norm in this case. Therefore, the argument, made in *Boston* as in *Primrose,* that the mailings occurred after completion of the scheme is obviously meritless here.

Boston relies almost exclusively on *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), and the argument that the mailings were, in effect, compelled by state law. We rejected that argument in *Primrose,* at 1489–1490, and must reject it here also.

Accordingly, with the exception of the counts discussed in Part V, *infra,* the mail fraud convictions must be affirmed.

V

 Finally, in reviewing this record we have concluded that the convictions on three counts must be reversed. On Count 49, one of the mail fraud counts, the exhibit relied on to establish the payment by the county through the mails shows explicitly that the warrant was not mailed but was delivered in person. V R. Exhibit 5–49–A. Hence this conviction is defective.

 On Counts 29 and 33, alleging mail fraud in accepting kickbacks from supplier Bobby Detrick, Detrick's testimony was that he was fairly certain that he had *not* paid a kickback on those transactions. Tr. 299–301. The testimony indicated that Detrick had reviewed the exhibits prior to trial and that in the process of doing so had noticed these two transactions particularly. He testified that these purchases were of supplies on which, for unspecified reasons, kickbacks probably would not have been paid. (There was testimony that vendors' margin of profit on some items would be too low to pay a ten percent kickback, but Detrick did not say clearly why he would not have paid kickbacks on these purchases.) The evidence, even when viewed in the light most favorable to the government, clearly is insufficient to sustain the convictions on these two counts. *See United States v. Wright,* 450 F.2d 992, 993–94 (10th Cir.1971).

VI

In conclusion, we have found Boston's claims of error to be without merit. Accordingly, the convictions on all counts are affirmed, except the convictions on Counts 29, 33 and 49, which are reversed.