**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**R.A. LOTSPEICH, Defendant-Appellant.**

No. 85–2124.

United States Court of Appeals,
Tenth Circuit.

July 14, 1986.

Layn R. Phillips, U.S. Atty., N.D. Oklahoma, for plaintiff-appellee.

Mary E. Bane of Oyler & Bane, Oklahoma City, Okl. (Mac Oyler of Oyler & Bane, Oklahoma City, Okl., and Henry A. Meyer, III, of Hieronymus, Hodgden &

641 F.2d 1340 (9th Cir.1981); *Weber v. Harris,* 640 F.2d 176 (8th Cir.1981); *Miranda v. Secre-* *tary,* 514 F.2d 996 (1st Cir.1975).

Meyer, Woodward, Okl., with her on brief), for defendant-appellant.

Before HOLLOWAY, Chief Judge, and BARRETT and SEYMOUR, Circuit Judges.

BARRETT, Circuit Judge.

R.A. Lotspeich (Lotspeich) appeals his jury conviction of attempting to obtain money from the Green County Racing Association (GCRA) by actual and/or threatened fear of economic loss in violation of 18 U.S.C. § 1951[1] (§ 1951). The relevant facts may be briefly summarized.

In September, 1982, Oklahoma voters passed a bill approving parimutuel horse-racing. The Oklahoma Horse Racing Commission (OHRC or Commission) was established to regulate the horse-racing industry. The Commission's responsibilities included reviewing and approving all race-track license applications. Various groups, including GCRA, were organized to promote racetracks.

In December, 1983, GCRA filed an application with the Commission for a license to build a racetrack, Winchester Park, in the Okmulgee, Oklahoma area. GCRA's application was denied by the Commission on October 4, 1984.

Shortly after GCRA's application was denied, Lotspeich contacted William Crews, President of GCRA, and requested an appointment to discuss GCRA's application with the Commission. Subsequent thereto Lotspeich met with Crews and other officers of GCRA on various occasions. Lotspeich related that GCRA would not receive a racetrack license without his help, and for a fee of $2,300,000 he would help them get their racetrack license application approved by the Commission. During the course of the meetings, several GCRA officers became concerned about the legality of Lotspeich's proposals and notified the FBI. Thereafter, several conversations between Lotspeich and GCRA officers were tape recorded. GCRA did not receive a racetrack license.

Lotspeich was subsequently indicted for attempting to obtain money from GCRA by actual and/or threatened fear of economic loss in violation of § 1951. At trial, GCRA's officers testified in detail relative to numerous meetings with Lotspeich during the course of which he indicated that he knew how things were done in Oklahoma, that they would not receive a racetrack license without his help, and that for a $2,300,000 fee, he would help them get a license. Lotspeich defended on the basis that his discussions with GCRA officers were nothing more than a legitimate business proposal and that he could have earned his requested $2,300,000 fee by cutting GCRA's estimated construction costs. Lotspeich acknowledged that the taped conversations supplied by the FBI were accurate insofar as they were audible.

In the course of Lotspeich's sentencing proceeding, the district court observed:

Last night I reread, carefully reread, the transcripts of the tapes that were played before the jury....

As I went through the transcript, there is absolutely no question in this court's mind as to what you were doing. This kind of an example of what happens in that backhanded throw out—it isn't a threat—that's the way you threaten people by telling them you're not threatened. That's like telling them you got a gun against them but it isn't loaded.

Time and time again, throughout the transcript, the subject matter, the clear input of what is said is that if you're going to get a racetrack in Oklahoma, it's going to cost you two point three million dollars. There is absolutely no other conclusion that any fair minded person could come to.

---

1. Section 1951 provides in part:
 (a) Whoever in any degree ... affects commerce ... by robbery or extortion or attempts or conspires so to do ... shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

 (b) As used in this section—
 (3) The term "commerce" means ... all commerce between any point in a State ... and any point outside thereof.

You're a man of stature. You're a man who's been politically active and knowledgeable, who held many important positions.... And the words you were speaking played directly, clearly, unequivocally, into the belief that government is corrupt. It takes money to buy whatever you want. And the officials are for sale. And the influence peddlers are the only way you can get anything. You talked about bank charters, the many other references. I think you can describe it no other way. And your contact was a sabotage of this type and form of government that we have.

(R., Vol. II pp. 6–8.)

The court, after noting that Lotspeich was a "man of education, prominence, wealth, multi-millionaire" (R., Vol. II p. 8) sentenced Lotspeich to ten years imprisonment. On December 5, 1985, we affirmed the order of the district court denying bail pending appeal.

On appeal, Lotspeich contends that: (1) the evidence was insufficient to prove an effect on interstate commerce; (2) the court denied him the opportunity to present his defense theories; (3) the arguments of the prosecutor were highly prejudicial; (4) the indictment was insufficient on its face to charge a violation of § 1951; and (5) the court, by its instructions, amended the indictment.

## I.

Lotspeich contends that the evidence was insufficient to prove an effect on interstate commerce and that the "law requires that an attempted extortion affect interstate commerce in order to be a violation of the Hobbs Act. 18 U.S.C. § 1951." (Brief of Appellant at 23.) Lotspeich acknowledges that the nexus between the extortionate conduct and interstate commerce may be *de minimis* but it must nonetheless exist. *Id.* at 24 citing *United States v. De Met*, 486 F.2d 816, 822 (7th Cir.1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), and *United States v. Elders*, 569 F.2d 1020 (7th Cir.1978).

In *United States v. Boston*, 718 F.2d 1511, 1516 (10th Cir.1983), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984), we stated:

Boston next argues that the government's evidence failed to establish sufficient interference with interstate commerce to constitute a violation of the Hobbs Act....

The language of the Hobbs Act specifically proscribes interference *"in any* way *or degree* ... by robbery or extortion." 18 U.S.C. § 1951(a) (1976) (emphasis added). As the Supreme Court observed in *Stirone [v. U.S. ]*, "[the Hobbs] Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion...." 361 U.S. at 212 [80 S.Ct. at 270, 4 L.Ed.2d at 252 (1960) ]. Although this is apparently the first time the issue has been before this court, several other circuits have held that the clear language of the Act makes any *de minimis* effect on commerce sufficient to sustain federal jurisdiction....

The Hobbs Act requires no more than a showing of a limited effect on interstate commerce. *United States v. Worley*, 751 F.2d 348, 351 (10th Cir.1984). The purpose of the Act was "to prevent anyone from obstructing, delaying, or affecting commerce, or the movement of any article or commodity in commerce by robbing or extortion as defined in the 671." *United States v. Cubert*, 435 U.S. 371, 377, 98 S.Ct. 1112, 1116, 55 L.Ed.2d 349 (1971) quoting H.R. Rep. No. 238, 79th Cong., 1st Sess., 9 (1945). We hold that the evidence presented by the Government established that GCRA was an interstate venture from its inception and that the nexus between Lotspeich's attempted extortion and interstate commerce was well above the *de minimis* effect level acknowledged by Lotspeich.

Gary Crews, a vice-president and secretary of GCRA testified that: 20% of the GCRA founder's stock was sold out of Oklahoma and included sales to investors in

Kansas, California, Alabama, and Florida (R., Vol. XVII p. 21); GCRA hired consultants from Ohio and Texas, and a trainer and jockey from New York (*Id.* at 22); the proposed track was to be located on U.S. Highway 75 with the hope that the track would draw people from areas outside of Oklahoma including the states of Kansas, Arkansas, Louisiana, and Texas. (*Id.* at 24.) Frank Towns, a vice-president of GCRA testified that Lotspeich was to be paid his fee in Wichita, Kansas.

Under these circumstances, we hold that Lotspeich's attempted extortion activities affected interstate commerce.

## II.

Lotspeich contends that he "was denied his theories of defense by the court's refusal to allow him to present evidence of the unreasonableness of the fear of the GCRA officials." (Brief of Appellant at 27.) Lotspeich argues that the excluded evidence "would have shown ... that the officials could not reasonably be placed in fear of economic loss by the defendant's extortionate conduct because *they knew* the GCRA was insufficiently financed, had always been insufficiently financed, and could not meet the OHRC standards for financing, no matter what the defendant might say or do." (*Id.* at 29.) Lotspeich argues that under such circumstances he could not, as a matter of law, have been guilty of extortion.

■ This argument is presented without any supporting authority. Furthermore, it was not presented to the district court. The unreasonableness of the fear theory was not advanced in connection with any of the excluded evidence. Issues not raised in the district court will not be considered for the first time on appeal when, as here, "there is no showing of an impediment to the appellant that precluded his raising the issue." *United States v. Mitchell,* 783 F.2d 971, 995 (10th Cir.1986).

**2.** Appendix, *infra.*

## III.

■ Lotspeich contends that comments[2] of the prosecutor made during closing arguments, none of which were objected to, deprived him of his right to a fair trial. Lotspeich argues that the "evidence before the jury was the Government's case versus the defendant's testimony." (Brief of Appellant at p. 37), that his credibility "was paramount" (*Id.* at p. 38), and that the prosecutor's comments "can be nothing more than prejudicial" (*Id.*).

In *United States v. Dickey,* 736 F.2d 571, 595 (10th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985), we held that certain comments by the prosecutor constituted prosecutorial misconduct requiring a new trial:

The primary question before us is whether the comments made by the prosecutor were so prejudicial as to deprive any appellant of his sixth amendment right to a fair trial. There are numerous cases in this Circuit which have held certain "response" comments by the prosecution to constitute prosecutorial misconduct requiring a new trial. *See, e.g., United States v. Young,* [736 F.2d 565, 569–70] No. 81–1536, slip op. at 9–11 (10th Cir. Feb. 22, 1983), *cert. granted* [465] U.S. [1021], 104 S.Ct. 1271, 79 L.Ed.2d 676 (1984) (prosecutor asserted personal opinion of appellant's guilt and related incorrect financial evidence); *United States v. Rios,* 611 F.2d 1335, 1341–43 (10th Cir.1979), *cert. denied,* 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981) (prosecutor personally attacked defense counsel, accused defense counsel's investigator of contriving testimony, argued facts not in evidence, expressed personal belief of appellant's guilt, and referred, without basis in the record, to prosecution witnesses being in danger); *United States v. Latimer,* 511 F.2d 498, 502–03 (10th Cir.1975) (prosecutor argued facts not in evidence and put personal knowledge and belief before jury); *United States v. Ludwig,* 508 F.2d 140, 143 (10th Cir.1974) (prosecutor personally

vouched for credibility of government witness).

In *United States v. Young*, 736 F.2d 565 (10th Cir.), *cert. granted*, 465 U.S. 1021, 104 S.Ct. 1271, 79 L.Ed.2d 676 (1984), we held that the prosecutor's closing argument was prejudicial and improper in that the prosecutor stated his opinion, without objection, that the defendant was guilty. We held that the prosecutor's remarks "[w]ere sufficiently egregious to constitute plain error." *Id.* at 570. The Supreme Court reversed. In *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court held that absent a timely objection the reviewing court must evaluate the case by viewing the claim of prosecutorial misconduct against the entire record in order to assess the seriousness of the claimed error.

Applying the standard set forth by the Supreme Court in *United States v. Young*, *supra*, we hold that the prosecutor's comments did not deprive Lotspeich of a fair trial. Many of the prosecutor's comments were directed to Lotspeich's credibility. Lotspeich has acknowledged that his testimony was "paramount" and the case "before the jury was the government's case versus the defendant's testimony." Lotspeich placed his credibility before the jury and developed his entire defense around it. The comments of the prosecutor were directed to that defense. They did not violate Lotspeich's right to a fair trial.

In this case, where both sides vigorously summarized their respective positions during the course of closing arguments we are reminded that the prosecutor's closing arguments need not be "confined to the detached exposition as would be appropriate in a lecture." *United States v. Bishop*, 534 F.2d 214, 220 (10th Cir.1976) quoting *United States v. Isaacs*, 493 F.2d 1124, 1164 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). This was an emotionally charged trial, evidenced by the court's observations at the time of sentencing, *supra*.

## IV. and V.

Lotspeich contends that the indictment was insufficient on its face to charge a violation of the Hobbs Act, 18 U.S.C. § 1951. Lotspeich also contends that the trial court amended the indictment by its instructions.

**a.**

 Lotspeich argues that "[b]ecause of the total lack of allegations in the indictment to show the nexus between the extortionate conduct of the defendant and an effect on interstate commerce, the indictment should have been dismissed." (Brief of Appellant at 43.) The indictment returned against Lotspeich charged, *inter alia:*

The GREEN COUNTRY [sic] RACING ASSOCIATION is engaged in interstate commerce, and the proposed race track would have been engaged in interstate commerce if approved for construction by the OKLAHOMA RACING COMMISSION. Building materials for said construction were to be obtained, in part, from out of state sources. The proposed track would bring horses and horse racing fans from across Oklahoma and from out of state for the economic benefit of GREEN COUNTRY [sic] RACING ASSOCIATION and the State of Oklahoma. The financial commitments relating to the amended application for construction approval for GREEN COUNTRY [sic] RACING ASSOCIATION, which was denied by the OKLAHOMA RACING COMMISSION on November 2, 1984, involved investors from the State of Oklahoma, investors from other states, and investors from foreign countries, including but not limited to an approximate $70 million first mortgage on the realty from 1st Mortgage Investment Company of Houston, Texas; $20 million in public utility bonds packaged by E.F. Hutton of Houston, Texas; and $35 million in equity financing from Consultancy Holdings PLC of London, England.

\* \* \* \* \* \*

Beginning on or about October 12, 1984, and continuing until on or about

November 2, 1984, within the Northern District of Oklahoma and elsewhere, defendant R.A. LOTSPEICH did knowingly and willfully attempt to commit extortion, which attempt, if successful, would have affected commerce as defined by Title 18, United States Code, Section 1951 (b)(3), by attempting to obtain approximately $2 million from the GREEN COUNTRY [sic] RACING ASSOCIATION, with its consent induced by wrongful use of actual and threatened fear of economic loss, in that defendant R.A. LOTSPEICH did wrongfully utilize fear in an effort to cause GREEN COUNTRY [sic] RACING ASSOCIATION to believe that absent a $2 million payment to defendant R.A. LOTSPEICH and his company, Western Management Services, Inc., the OKLAHOMA RACING COMMISSION would deny GREEN COUNTRY [sic] RACING ASSOCIATION'S application for construction approval of the Winchester Park Race Track, in violation of Title 18, United States Code, Section 1951(a).

(R.Vol. I at pp. 7–9.) The Hobbs Act requires only a limited effect on interstate commerce. Furthermore, an indictment is sufficient if it provides the defendant with adequate notice of the charges and an opportunity to prepare his defense. *United States v. Worley*, 751 F.2d 348 (10th Cir. 1984). We hold that the indictment was not insufficient on its face: "The indictment described the scheme in a way to allow defendant to mount a defense." *Id.* at 350.

### b.

Lotspeich contends that the trial court amended the indictment by its instructions. Lotspeich, however, failed to object to the court's instructions. Lotspeich cannot object to the instructions for the first time on appeal. *United States v. Martinez*, 776 F.2d 1481, 1484 (10th Cir.1985); Fed.R. Crim.P. Rule 30, 18 U.S.C.

AFFIRMED.

## APPENDIX

Lotspeich acknowledges that he did not object to any of the prosecutor's closing arguments. The remarks of the prosecutor which Lotspeich now contends were prejudicial included:

Common sense, ladies and gentlemen, will tell you that the tape recordings you heard in this case, the tape recordings that you heard, unlike the defendant's testimony, were uncoached realities. The defendant's—the tapes you heard in this case were a window to the defendant's mind. The old saying on the Candid Camera Show, the tapes in this case show that the defendant was caught in the act of being himself. That's what the tape evidence in this case shows. (R.Vol. XXI at pp. 8–9.)

\* \* \* \* \* \*

And then, ladies and gentlemen, you heard this, and this is the case, this is the case right here. This is the only case that I suggest you'll ever encounter where you heard the defendant's alibi on tape before he was ever arrested, because all these gentlemen are going to talk about is construction costs, and how bad Winchester Park is—and it's not because they're not good lawyers. They're outstanding attorneys, but they're in strait jackets, because their defendant, client, R. A. Lotspeich, put them in a strait jacket on October 31st. He says when you're talking to these other people, Crews and Tours and all these other people, says everything right out to you, we would talk to them on the basis of being able to save them considerably on the amount of construction cost. In other words, that's what you tell them. Then, God, if they ever got me before the grand jury, I would probably deny that I ever talked to you about anything other than construction costs. And the more people that you've got in—he even says it's okay to talk to Frank, you can talk to Frank. But what's his explanation for this? He says I came to talk to you, because you were more aware of Oklahoma politics. How does politics get to

be involved if it's a legitimate business deal? Huh? If it's a legitimate business deal.

This is a promise, ladies and gentlemen, it's a promise to lie. It's a promise to take the stand in front of a grand jury and say I never talked to Larry Reasor about bid rigging, and tape recorders, and any of this other stuff. We only talked about construction costs. He didn't know he was being recorded, and now he's locked in to it, and he just can't get out of it, and that's why they're going to get up there are tell you about construction costs and tell you about these other things. (*Id.* at pp. 36–37.)

\* \* \* \* \* \*

Ladies and gentlemen, I'm almost at the conclusion of my argument, but you're going to have to decide the credibility of the defendant in this case, and I suggest to you that in this particular case the defendant R.A. Lotspeich had the greatest motive to lie of any witness who testified, and he told a story that was conceived in desparation. He tried to make it fit between the testimony of the other witnesses, and it won't fit, because he wasn't truthful. And he wasn't truthful because he was guilty. (*Id.* at pp. 39–40.)

\* \* \* \* \* \*

Let me begin my final remarks by saying this. As jurors in a criminal case, you should never be worried whether or not the government wins or loses a case, and the reason for that is real simple, because the government, ladies and gentlemen, always wins when justice is done. The government wins when an innocent person is set free, and the government wins when the guilty are convicted.

Ladies and gentlemen, in the next few minutes I'm going to be telling you why there's no innocent people named in this indictment. I'm going to be telling you why based on the evidence in the case, and the evidence alone, you should return a verdict of guilty as to the defendant.

Ladies and gentlemen, I also want to say one other thing before we start. If you believe for a second as was suggested during the argument of Mr. Wohlgemuth, that the government somehow played a master puppeteer role and got seven people to come in here and lie under oath about this whole situation, just to get this influence peddler from Western Oklahoma, then ladies and gentlemen, do yourself, do the entire system a favor, when you go back there, let him loose, acquit him, find him not guilty. If you think that for a second, do ourselves, the attorneys and everybody a favor. (*Id.* at pp. 76–77.)

\* \* \* \* \* \*

They told you they were going to do all these wonderful things, and you'll see when you get back there, defendant's exhibit 200, and we've got defense exhibit 26. You won't see 1 through 25. You won't see 26 through 199. So what they did is they got up and honked and flapped and screamed and yelled about how bad the government was and how all these people came in and testified under oath and lied about the defendant Lotspeich. I mean that's what you've got to believe to acquit the defendant in this case, because look what happened in this case. The defense puts on the defendant Lotspeich. General McArthur once described one of his enemies as a man who would never tell the truth when a lie would suffice. And that's what the defendant R.A. Lotspeich is. He's just wrapped in a strait jacket. He would say anything, like a worm on a hook, to get out of it. He goes over to the Horse Racing Commission, reviews all the files, reads the witness statements, He's [sic] the only witness of the entire defense who testified about the crime. (*Id.* at pp. 78–79.)