**UNITED STATES of America, Plaintiff–Appellee/Cross–Appellant,**

v.

**Chester Vernon ZEIGLER, Defendant–Appellant/Cross–Appellee.**

Nos. 92–5115, 92–5135.

United States Court of Appeals,
Tenth Circuit.

March 7, 1994.

* Ruggero J. Aldisert, United States Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

Robert Nigh, Jr., Asst. Federal Public Defender, Tulsa, OK, for defendant-appellant/cross-appellee.

Allen J. Litchfield, Asst. U.S. Atty. (Tony M. Graham, U.S. Atty., with him on the brief), Tulsa, OK, for plaintiff-appellee/cross-appellant.

Before SEYMOUR, Chief Judge, and McWILLIAMS, and EBEL, Circuit Judges.

SEYMOUR, Chief Judge.

Defendant Charles Zeigler appeals the District Court's order denying his motion for judgment of acquittal. Mr. Zeigler was convicted by a jury of eight separate counts, the first six of which are at issue in this appeal. Each of the six counts charged Mr. Zeigler with carrying a firearm during a robbery affecting interstate commerce, in violation of the Hobbs Act, 18 U.S.C. §§ 1951, 924(c)(1). Mr. Zeigler contends that the evidence presented at trial was insufficient to establish the effect on interstate commerce necessary to confer federal jurisdiction under the Act. On cross appeal, the government argues that Mr. Zeigler's sentence is illegal because the district court did not impose an enhancement

for Mr. Zeigler's second and subsequent convictions as required by section 924(c). For the reasons stated below, we AFFIRM the convictions but REMAND for resentencing.

## I.

## BACKGROUND

■ The charges against Mr. Zeigler arose from a crime spree that resulted in the armed robbery of six separate businesses in Tulsa, Oklahoma. The robberies discussed below correspond to counts one through six respectively. We view the evidence, together with all reasonable inferences to be drawn therefrom, in the light most favorable to the government. *United States v. Grimes,* 967 F.2d 1468, 1472 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992); *United States v. Haskins,* 737 F.2d 844, 846 (10th Cir.1984).

The robbery spree began on August 29, 1991, when Mr. Zeigler robbed the Lucky Stop convenience store of $800 cash. Lucky Stop sells a variety of goods, many of which it buys from Affiliated Food Stores, Inc., a Tulsa-based food supplier. Affiliated Foods purchases many of its products from sources outside Oklahoma. Thus, Lucky Stop indirectly receives goods that originate outside the state. For example, Lucky Stop sells cigarettes and candy bars that it buys from Affiliated Foods. Affiliated Foods purchases the cigarettes from North Carolina and the candy products from New Jersey and Pennsylvania. Affiliated Foods also supplies Lucky Stop with canned goods and paper products that are manufactured outside Oklahoma.

On September 1, Mr. Zeigler robbed a Vickers gas station and escaped with about $650 taken from the cash register and floor safe. In addition to selling gas, Vickers sells tobacco products, candy, drugs, chips, and general food products. Most, if not all, of the products Vickers sells are purchased directly from the Harrison Company located in Shreveport, Louisiana. The money Mr. Zeigler took from Vickers would have been used to purchase other products to sell in the store, and it is undisputed that the robbery affected the business.

The third robbery occurred on September 12, when Mr. Zeigler robbed the Apco Hudson Oil station of $160. This service station sells gasoline as well as cigarettes, beer, candy, chips, magazines, and various beverages. Over fifty percent of the products that Apco Hudson Oil sells are manufactured or produced outside Oklahoma. The money taken by Mr. Zeigler would have been used to replenish goods sold in the store and to continue the business.

Mr. Zeigler continued his crime spree on September 13 by robbing Mazzio's Pizza restaurant of approximately $300. Ninety-five percent of the products Mazzio's uses to make its food comes from outside the state. It is uncontroverted that the robbery affected Mazzio's business and that the money Mr. Zeigler took would have been used in part to purchase more products.

One day later, Mr. Zeigler robbed Keith's Food Store of between $350 and $500. Keith's Food Store spends between $3000 and $4000 a month to purchase grocery products, and approximately ninety-five percent of the products sold in the store comes from outside Oklahoma. For example, the store purchases various products from Nabisco in New Jersey, from Nestle in Maryland, and from Texas and North Carolina. The owner of Keith's Food Store testified that the robbery affected his business and that the money taken by Mr. Zeigler would have been used in part to pay for more goods. On cross-examination, the store owner testified that he was not certain whether the store spent more or less than average on out-of-state goods for the month of the robbery or for the months prior to and following the robbery.

Mr. Zeigler's sixth and final robbery occurred on September 16 when he entered Rex's Fried Chicken Restaurant carrying a gun, ordered all the employees to sit on the floor behind the counter, and absconded with over $1500 from two separate cash registers. All the chicken sold by the Rex's chain, including the restaurant Mr. Zeigler robbed, is purchased from Bingham Foods located in Springfield, Missouri. Rex's also purchases breading formula, onion rings, and honey

from sources outside Oklahoma. The owner of Rex's restaurants stated that the $1500 Mr. Zeigler took would have been used to buy more chicken, to pay bills, employees, rent, utilities, and taxes, and that the robbery had a direct impact on the bottom line of the business. On cross-examination, Rex's owner testified that she purchased "about the same" amount of out-of-state goods in the month following the robbery as she did in September, the month of the robbery. She also testified that she was probably not late paying her September bill for out-of-state goods for the robbed restaurant because she is able to draw money from other restaurants if needed to pay bills.

## II.

## FEDERAL JURISDICTION UNDER THE HOBBS ACT

Having been convicted on all six counts, Mr. Zeigler now challenges the sufficiency of the evidence to support federal jurisdiction over any of these counts under the Hobbs Act. He contends the government failed to prove the robberies had any effect on interstate commerce.

The Hobbs Act provides for the punishment of anyone who *"in any way or degree* obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do." 18 U.S.C. § 1951(a) (1988) (emphasis added). The statute broadly defines the term "commerce" to encompass "all commerce between any point in a State, ... and any point outside thereof; ... and all other commerce over which the United States has jurisdiction." *Id.* § 1951(b)(3).

■ Hobbs Act jurisdiction is based on Congress' broad authority to regulate interstate commerce. As the Supreme Court noted in *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference 'in any way or degree.'" *Id.* at 215, 80 S.Ct. at 272 (citing 18 U.S.C. § 1951(a)); *see also United States v. Culbert*, 435 U.S. 371, 373, 98 S.Ct. 1112, 1113, 55 L.Ed.2d 349 (1978) (rejecting any limitation of the Hobbs Act to "racketeering" only and concluding that words used by Congress in the Act "do not lend themselves to restrictive interpretation.").[1]

### A. Effect–On–Commerce Requirement

■ In accordance with the plain language of the statute, this court has held that the jurisdictional predicate of the Hobbs Act can be satisfied by a showing of "any *de minimis* effect on commerce." *United States v. Boston*, 718 F.2d 1511, 1516 (10th Cir.1983), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984); *see United States v. Lotspeich*, 796 F.2d 1268, 1270 (10th Cir. 1986) ("The Hobbs Act requires no more than a showing of a limited effect on interstate commerce."); *United States v. Norris*, 792 F.2d 956, 958 (10th Cir.1986) ("A de minimis effect on commerce has been held to be enough to violate § 1951."); *see also United States v. Brown*, 959 F.2d 63, 67 (6th Cir.1992) (citing cases from numerous other circuits accepting *de minimis* rule). The minimal effect on commerce may be established by evidence of a "mere 'depletion of assets' of a firm engaged in interstate commerce." *Norris*, 792 F.2d at 958; *see Boston*, 718 F.2d at 1516. Under the "depletion of assets" theory,

---

1. It is generally recognized that Congress has extremely broad jurisdiction under the Commerce Clause. *See* Tribe, *American Constitutional Law* 310–11 (2d ed. 1988). *See, e.g., Perez v. United States*, 402 U.S. 146, 153–55, 91 S.Ct. 1357, 1361–62, 28 L.Ed.2d 686 (1971) (Congress has constitutional power under Commerce Clause to regulate purely intrastate "loansharking" because of connection between local loan sharks and interstate crime); *Wickard v. Filburn,* 317 U.S. 111, 127–28, 63 S.Ct. 82, 90–91, 87 L.Ed. 122 (1942) (Congress has power under Commerce Clause to regulate farmer's production of wheat for purely home use because home-grown wheat is likely to reduce individual's demand for market wheat, and cumulative effect of home consumption of wheat by others similarly situated could have substantial effect on interstate wheat market).

commerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted ..., thereby curtailing the victim's potential as a purchaser of such goods.

*United States v. Elders,* 569 F.2d 1020, 1025 (7th Cir.1978).

In *United States v. Whitt,* 718 F.2d 1494, 1500 (10th Cir.1983), a case involving kickbacks paid to Oklahoma county officials by various vendors, this court approved jury instructions on the depletion of assets theory.[2] *See also Boston,* 718 F.2d at 1516–17. The defendant-county commissioner argued that in one of the three extortion counts there was no evidence the vendor was involved in interstate commerce. We acknowledged defendant's claim, but nevertheless upheld the conviction on this count because evidence showed the *county's assets* were depleted as a result of the kickback scheme. *Whitt,* 718 F.2d at 1500. Given the reduction in the county's assets and the county's regular practice of purchasing goods in interstate commerce, the evidence was sufficient "for the jury to make the required finding to support the conviction on this count." *Id.* Significantly, there was no evidence that the county actually purchased fewer goods as a result of the kickback scheme.

The fact that the Hobbs Act also prohibits "attempted" robbery or extortion, 18 U.S.C. § 1951(a), lends credence to the expansive interpretation courts have given to the statute. Many courts, including this one, have sustained jurisdiction under the Hobbs Act in cases of attempted robbery or attempted extortion presenting only potential effects on interstate commerce. In *Lotspeich,* 796 F.2d 1268, for example, the defendant was convicted of *attempting* to extort money from a racing association promoting the develop-

ment of a horse-racing track. The defendant argued on appeal that the evidence was insufficient to establish an effect on interstate commerce. We held that the government's evidence showed "the nexus between Lotspeich's attempted extortion and interstate commerce was well above the *de minimis* effect level" required by the Act. *Id.* at 1270. We then listed the evidence justifying jurisdiction under the Act: (1) twenty percent of the racing association's stock was sold outside Oklahoma, (2) the racing association hired employees from out of state, (3) the *proposed* track *was to be located* on U.S. Highway 75 with the *hopes* of attracting out-of-state customers, and (4) the defendant *was to be paid* his fee in Wichita, Kansas. *Id.* "Under these circumstances, ... Lotspeich's attempted extortion activities affected interstate commerce." *Id.*

The holdings in *Lotspeich* and other cases illustrate how little the government must show to satisfy the jurisdictional element of the Hobbs Act. *See, e.g., Boston,* 718 F.2d at 1516–17 (government need only prove that defendant " 'actually or potentially obstructed, delayed or affected interstate commerce or attempted to do so.' "); *see also United States v. Brown,* 959 F.2d 63, 67–68 (6th Cir.1992) (evidence in attempted robbery case sufficient if it shows realistic probability of depletion of assets); *United States v. Curcio,* 759 F.2d 237, 241–42 (2d Cir.) (in attempted extortion case, effect on commerce need only be "potential or subtle"), *cert. denied,* 474 U.S. 848, 106 S.Ct. 142, 88 L.Ed.2d 117 (1985); *United States v. Staszcuk,* 517 F.2d 53, 60 (7th Cir.) (jurisdictional element satisfied by "realistic probability" that extortionate conduct will have some effect on commerce), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

---

2. The instruction approved in *Whitt* charged the jury that the government could carry its burden on the jurisdictional element in three separate ways. The first two methods explain the depletion of assets theory and illustrate how little the government must prove under this theory to establish jurisdiction under the Act. The government was required to establish:

(1) that the vendor was engaged in commerce and that depletion of the vendor's assets would

be the natural consequence of the alleged extortion; (2) that Seminole County was engaged in commerce and that depletion of its assets would be a natural consequence of the alleged extortion; *or* (3) that the vendor purchased supplies from outside the State of Oklahoma which were then brought into the State and delivered to Seminole County as a result of the alleged extortion.

*Id.* (emphasis added).

*B. Evidence Was Sufficient To Support Conviction*

"The evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Hooks,* 780 F.2d 1526, 1531 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). In making our determination, we review the record de novo. *United States v. Grimes,* 967 F.2d 1468, 1472 (10th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992). Applying the depletion of assets theory,[3] we conclude that the evidence was sufficient on all six counts to support Mr. Zeigler's convictions under the Hobbs Act.

### 1. All Six Businesses Were Engaged in Interstate Commerce

The evidence is uncontroverted that all six victimized businesses were engaged in interstate commerce. Each of the businesses except Lucky Stop purchased the majority of its products directly from out-of-state suppliers. Lucky Stop purchased goods from an Oklahoma distributor who in turn purchased the goods it supplied to Lucky Stop from outside the state. This indirect link to interstate commerce is sufficient to establish that Lucky Stop was engaged in interstate commerce. *See Brown,* 959 F.2d at 68 (requisite effect exists where product sold by local distributor to local bar was manufactured out of state); *United States v. Cerilli,* 603 F.2d 415, 424 (3rd Cir.1979) (depletion of assets theory applies where goods purchased by victim *originate* out of state), *cert. denied,* 444 U.S.

1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980); *United States v. DeMet,* 486 F.2d 816, 821–22 (7th Cir.1973) (jurisdictional element satisfied where products bought from in-state suppliers but manufactured outside state), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). We hold that the evidence in this case was sufficient to show that all six businesses were engaged in interstate commerce.

### 2. Depletion Of Assets

Viewing the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the government, we conclude that the evidence was sufficient for the jury to infer that the depletion of the assets of all six businesses obstructed, delayed, or affected interstate commerce. The money taken in the robberies ranged from a low of $160 to a high of approximately $1500, amounts we do not consider so trivial as to automatically place these robberies beyond the reach of the Act. *See, e.g., United States v. Augello,* 451 F.2d 1167, 1170 (2d Cir.1971) ($100 taken directly from restaurant's cash register to pay extortionist showed depletion of assets, "which by itself may impair the efficient conduct of [restaurant's] business sufficiently to affect commerce"), *cert. denied,* 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972); *United States v. Provenzano,* 334 F.2d 678, 692 (3rd Cir.) ("The specific amount of such money obtained by extortion or the precise manner or degree to which it had an effect on the business is of no consequence."), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964).

Not only is the evidence undisputed that the businesses' assets were depleted in the

---

**3.** The briefs and the evidence all show that the United States was proceeding on a "depletion of assets" theory. The district court instructed the jury as follows:

> The term "obstructs, delays, or affects commerce" means any action which, in any manner or to any degree, interferes with, changes, or alters the movement or transportation or flow of goods, merchandise, money, or other property in interstate commerce (commerce between any place in a state and any place outside of that state).
>
> It is not necessary for the government to prove that the defendant actually intended to

obstruct, delay, or affect interstate commerce. The government must prove beyond a reasonable doubt, however, that the defendant deliberately performed an act, the ordinary and natural consequences of which would be to obstruct, delay, or affect interstate commerce, and that interstate commerce was, in fact, obstructed, delayed or affected.

> You are instructed that the law requires no more than a small or minimal effect on interstate commerce.

Rec., vol. I, doc. 21 at 18. Because neither party objected to this instruction, we assume for the purposes of this case that it is proper.

robberies of Lucky Stop, Vickers, Apco Hudson Oil, and Mazzio's Pizza (counts one through four respectively), it is also uncontroverted that the money Mr. Zeigler took was destined to be used, at least in part, to purchase other interstate goods. Because the Hobbs Act only requires a *de minimis* affect on commerce "in any way or degree," the evidence presented in these four counts was sufficient to support the jury's conclusion that the robberies affected interstate commerce.

While conceding that there was a depletion of assets in each of the six robberies, Mr. Zeigler contends that there was no showing of an effect on commerce, especially with respect to the robberies of Keith's Food Store and Rex's Fried Chicken Restaurant, counts five and six. In support of his argument for counts five and six, Mr. Zeigler points to testimony elicited on cross-examination which casts some doubt on whether the depletion of these businesses' assets actually resulted in the purchase of fewer goods. Viewing the evidence in the light most favorable to the government, however, we conclude for both counts five and six that the cross-examination testimony is not so overwhelming that no jury could reasonably infer that the depletion of these businesses' assets obstructed, delayed, or affected interstate commerce to the *de minimis* level required by the statute.

The cross-examination testimony of Mr. Keith DeWitt, the owner of Keith's Food Store, simply shows that Mr. DeWitt was uncertain whether the store actually purchased fewer out-of-state goods as a result of the robbery.[4] His testimony is not so conclusive that it would preclude a reasonable jury from concluding that Keith's Store actually purchased fewer interstate goods.

Similarly, Mr. Zeigler was charged in count six with taking $1500 from Rex's Fried Chicken Restaurant, a business that purchases all of its chicken and breading formula, as well as numerous other products, directly from out-of-state suppliers. The owner testified that the monies taken would have been used to purchase more interstate goods and to pay employees, rent, utilities, and taxes. She also testified that the robbery affected the bottom line of the business. On cross-examination, she testified that, with respect to the restaurant Mr. Zeigler robbed,[5] she probably purchased "about the same" amount of chicken and other out-of-state products in October, the month following the robbery, as in September, the month of the robbery. She also stated that she was probably not late with her September bills for out-of-state goods because she was able to draw money from some of her other stores. Rec., vol. III, at 108–09. Viewing the evidence in the light most favorable to the government, we believe a reasonable jury could conclude from the owner's direct testi-

---

4. After Mr. DeWitt testified on direct examination that the money robbed by Mr. Zeigler would have been used in part to purchase more interstate goods, the defense elicited the following testimony on cross-examination:

Q. [by defense counsel] During the month of August, 1991, do you know how much money your store, Keith's Food Store, spent on goods from out of state?
A. [by Mr. DeWitt] We spend anywhere from probably $3,000 to $4,000 a month in products, grocery products.
Q. Do you know how much you spent during the month of August 1991?
A. Something along that line.
Q. Do you know an exact amount?
A. I'd have to go back to the records to pull that out.
Q. During the month of September of 1991 how much money did Keith's Food Store spend on goods from out of state?
A. I would say, without looking at the records, it would be along the same lines.

Q. Was there any change between August and September of 1991?
A. Without looking at my records I couldn't really say that, because I don't run on a day-to-day basis of numbers.
Q. During October of 1991 do you know how much money Keith's Food Store spent on products that came from out of state?
A. I would guess probably about what I've just said. Without looking at the records, I'm not exact on any of that information.
Q. Was there any change between September of 1991 and October of 1991?
A. There may have been because products go up in price every year.
Q. Because products go up in price?
A. Yes, they go up in price.
Rec., vol. III, at 75–76.

5. The owner of Rex's testified that she owns eight other restaurants.

mony that this robbery obstructed, delayed, or affected commerce in some manner or degree, albeit minimal. To the extent her cross-examination testimony may have suggested otherwise, any conflict was for the jury to resolve.

A jury may infer that interstate commerce was affected to some minimal degree from a showing that the business assets were depleted. As one court stated,

> it was not necessary to show that any particular shipment of merchandise moving to and from [the business] was obstructed or delayed. It is a depletion of the resources of the business which permits the reasonable inference that its operations are obstructed or delayed.

*Espereti v. United States,* 406 F.2d 148, 150 (5th Cir.1969). Applying similar reasoning, in *Boston,* 718 F.2d 1511, we affirmed the Hobbs Act conviction of a County Commissioner in Oklahoma for extorting bribes from sellers of equipment and supplies to the county. The defendant appealed all seven counts of his conviction arguing the evidence was insufficient to establish interference with interstate commerce as required by the Act. We affirmed five of the seven counts because the suppliers sold goods that moved in interstate commerce and there was explicit testimony that the suppliers' assets were depleted by the extortion. *Id.* at 1517. Despite the lack of explicit testimony as to depletion of assets for the sixth count, we held "the jury easily would have been justified in drawing this conclusion." *Id.* Finally, we affirmed the last count because the county was involved in interstate commerce and "there was direct evidence that the county's assets were depleted by the kickback." *Id.* Thus, we held a mere depletion of assets sufficient to sustain the Hobbs Act violations

without any showing that the suppliers or the county actually purchased fewer goods because of the extortion. *See also Norris,* 792 F.2d at 958 (extortion payment that depleted assets of business engaged in interstate commerce deemed sufficient to show effect on interstate commerce); *United States v. O'Malley,* 796 F.2d 891, 898 (7th Cir.1986) (jury instruction *required* jury to find interstate commerce was affected if victim of extortion was engaged in interstate commerce and if money extorted from victim *could have been used* for the purchase of out-of-state goods); *Cerilli,* 603 F.2d at 424 (depletion of assets of business engaged in interstate commerce sufficient to bring extortion within reaches of Act); *United States v. Rabbitt,* 583 F.2d 1014, 1023 (8th Cir.1978) ("threatened effect" on interstate commerce sufficient to invoke the Act; depletion of assets of auto dealers association sufficient to show required effect on commerce), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *United States v. Hathaway,* 534 F.2d 386, 396–97 (1st Cir.) (depletion of assets of out-of-state firm with interstate connections sufficient to confer jurisdiction under Act), *cert. denied, Baptista v. United States,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976).

We therefore conclude that the evidence was sufficient for the jury to find the necessary *de minimis* connection between the robberies and interstate commerce on all counts.

## III.

### SENTENCING

Pursuant to 18 U.S.C. § 924(c),[6] the district court sentenced Mr. Zeigler to five years imprisonment on each of counts one through six, the sentences to be served con-

---

6. Section 924(c)(1) provides in pertinent part: Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five (5) years.... *In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years* .... Notwithstanding any oth-

er provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried. No person sentenced under this subsection shall be eligible for parole during the term of imprisonment imposed herein. 18 U.S.C. § 924(c)(1) (emphasis added).

secutively. The government did not object to the sentence imposed at the sentencing hearing. The government now contends, in light of the Supreme Court's subsequent decision in *United States v. Deal,* —— U.S. ——, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993), that the sentence imposed is illegal and that the district court should have sentenced Mr. Zeigler to twenty years for each subsequent conviction under section 924(c) as required by the statute. Mr. Zeigler argues that the government waived any objection to the sentence by not raising the issue below.

The district court sentenced Mr. Zeigler on May 22, 1992. At that time, we had determined that an enhanced sentence for a second or subsequent conviction under 18 U.S.C. 924(c)(1) was only proper when the underlying offense had been committed after a judgment of conviction on a prior section 924(c) offense. *See United States v. Abreu,* 962 F.2d 1447 (10th Cir.1992) (en banc). On May 17, 1993, however, the Supreme Court considered the same issue in *Deal v. United States,* —— U.S. ——, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993), and concluded to the contrary. The Court held that a second or subsequent conviction for purposes of section 924(c) can occur when two offenses are charged in the same indictment and the defendant is convicted of both offenses in the same trial.

The United States had petitioned for certiorari in *Abreu.* The Supreme Court granted the petition after it decided *Deal,* vacated the judgment in *Abreu,* and remanded the case for further consideration. On remand, we affirmed Abreu's enhanced sentence handed down by the district court. *United States v. Abreu,* 997 F.2d 825, 826 (10th Cir.1993).

▪ We must now decide whether the sentence imposed in this case, which is below the statutory minimum, is subject to review where the government raises the issue for the first time on direct appeal. The government's failure to object to the sentence imposed below may be excused because the law at the time of sentencing, as expressed in our en banc holding in *Abreu,* made clear that enhanced sentences were not permitted unless the underlying offense had been committed after a judgment of conviction in a prior section 924(c) offense. *Abreu* definitively foreclosed any government objection on this matter.[7] Furthermore, "[b]ecause the imposition of an illegal sentence would constitute plain error," *United States v. Vance,* 868 F.2d 1167, 1169 (10th Cir.1989), this court may review the sentence imposed for plain error even though the government failed to raise the issue below. *United States v. Voss,* 956 F.2d 1007, 1009 (10th Cir.1992); *see also* Fed.R.Crim.P. 52(b).

▪ Given the Supreme Court's interpretation of section 924(c) in *Deal,* the sentence imposed below, as it applies to the enhancement provision, is illegal and thus constitutes plain error. *See Vance,* 868 F.2d at 1169. Under the correct reading of section 924(c), Mr. Zeigler should be sentenced to twenty years for his second and subsequent convictions in accordance with the Supreme Court's decision in *Deal.*

## IV.

### CONCLUSION

Having found the evidence sufficient to support the convictions on all six counts, we think it necessary to comment on the broad reach of the Hobbs Act. It is not clear from the record in this case whether Mr. Zeigler was prosecuted in state court or what sentence, if any, he received there for the six robberies which the United States prosecuted here. It is clear, however, that

> the United States could in theory prosecute every would-be thief who had been prosecuted and sentenced for the conduct under state law, no matter how trivial the amount at issue. We question whether Congress ever intended the Hobbs Act to lead to this kind of "doubling" of sentences.

---

7. At the time the sentence was imposed, it would have been impossible for the government to raise any objection to the sentence based on the upcoming decision in *Deal,* —— U.S. ——, 113 S.Ct.

1993, since the petition for certiorari in *Deal* was not even granted until October 5, 1992, over four months after the sentencing hearing in this case.

*Brown*, 959 F.2d at 68. Despite any disagreement we may have with the federalization of traditionally local crimes and the resultant "doubling" of sentences in many cases, we nevertheless "recognize that any change must come from Congress rather than the courts." *Id.*

We AFFIRM the convictions on all counts. We REVERSE the sentence imposed for counts one through six and REMAND the case for resentencing in accordance with this decision.

EBEL, Justice, dissenting.

I respectfully dissent from the majority's decision to uphold the Appellant's convictions for Counts One through Six, and I join in the majority's decision to reverse the sentences imposed for Counts One through Six and to remand the case for resentencing on those counts.

I would reverse the Appellant's convictions for Counts One through Six, which were predicated on the Hobbs Act, 18 U.S.C. § 1951, because I do not think that the government met its burden of proving, beyond a reasonable doubt, that the robberies "affected interstate commerce" as that term is defined in the jury instructions that were given in this case. The interstate commerce element of a Hobbs Act violation is not superfluous—it is the hook by which the Federal Government gains jurisdiction.[1]

The Supreme Court held in *Stirone* that "[b]oth elements [interference with commerce and robbery] have to be charged. Neither is surplusage and neither can be treated as surplusage." *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960) ("The charge that inter-

state commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that inference."). Moreover, the government must meet the "beyond a reasonable doubt" standard for each element of a criminal offense. Therefore, for the government to have jurisdiction over an alleged Hobbs Act offense, it must prove beyond a reasonable doubt that interstate commerce was affected. *United States v. Boston*, 718 F.2d 1511, 1516 (10th Cir.1983) ("the jury was instructed that the government was required to prove that Boston 'actually or potentially obstructed, delayed or affected interstate commerce or attempted to do so' ") *cert. denied*, 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984).

The Hobbs Act's jurisdictional predicate can be satisfied if a mere *de minimis* effect on interstate commerce is shown. *See, e.g., Boston*, 718 F.2d at 1516–1517; *United States v. Norris*, 792 F.2d 956, 958 (10th Cir.1986) ("[a] de minimis effect on commerce has been held to be enough to violate § 1951"); *United States v. Whitt*, 718 F.2d 1494, 1500 (10th Cir.1983); *United States v. Lotspeich*, 796 F.2d 1268, 1270 (10th Cir. 1986). However, as this Court noted in *Lotspeich*, the "nexus between the extortionate conduct and interstate commerce may be *de minimis* but it must nonetheless exist." *Lotspeich*, 796 F.2d at 1270; *see also United States v. Staszcuk*, 517 F.2d 53, 59 (7th Cir.) ("Nor may we disregard the statutory language which requires the prosecutor to prove some connection with interstate commerce in every case.") *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

The government may prove an effect on interstate commerce by direct or indirect

---

**1.** The Hobbs Act's jurisdictional predicate is based on Congress' authority to regulate interstate commerce. The Hobbs Act provides, in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—
(3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction. 18 U.S.C. § 1951.

evidence. An example of direct proof is evidence of the obstruction of a specific product from crossing interstate lines. For example, evidence that a defendant extorted a kickback from an out-of-state supplier is direct evidence that the extortion affected the movement of that supplier's interstate sale of his or her product. An example of indirect proof is evidence of a company's inability to purchase the same amount of out-of-state products because extortion or robbery reduced its assets. Proof of an indirect effect on interstate commerce can be upheld only if the jury is presented with evidence sufficient to make a reasonable inference—beyond a reasonable doubt—that interstate commerce was affected. *Esperti v. United States*, 406 F.2d 148, 150 (5th Cir.) ("It is a depletion of the resources of the business which permits the reasonable inference that its operations are obstructed or delayed.") *cert. denied*, 395 U.S. 938, 89 S.Ct. 2005, 23 L.Ed.2d 458 (1969).

The Tenth Circuit has approved the indirect method of proving an effect on interstate commerce by inferring such an effect from a diminution of assets. We have held "that evidence of depletion of assets *may* establish the requisite [*de minimis* ] effect on commerce." *Boston*, 718 F.2d at 1516 (emphasis added); *see also Norris*, 792 F.2d at 958 ("[a] mere 'depletion of assets' of a firm engaged in interstate commerce will meet the [*de minimis* ] requirement").[2] However, like any other factual inference, this one can be allowed to substitute for direct proof only if, under all the facts, such an inference is reasonable. *Cf. United States v. Romano*, 382 U.S. 136, 139, 86 S.Ct. 279, 281, 15 L.Ed.2d 210 (1965), where the Supreme Court held that a statutory presumption will not be sustained if there was

"no rational connection between the fact proved and the ultimate fact presumed, if the inference of the one from proof of the

other is arbitrary because of lack of connection between the two in common experience.... [W]here the inference is so strained as not to have a reasonable relation to the circumstances of life as we know them, it is not competent for the legislature to create it...." (quoting *Tot v. United States*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943)).

A *de minimis* depletion of the assets of a business engaged in interstate commerce does not necessarily support a conclusion that interstate commerce has been affected. Instead, the government must provide enough evidence to support a reasonable inference of such an effect. The jury may draw such an inference, but only if it is provided sufficient *evidence* to support its conclusions. The question before this court is whether the jury was provided adequate evidence to conclude that the Appellant stole sufficient assets from his victims that it is likely, beyond a reasonable doubt, that each of the robberies affected interstate commerce.[3] And, this question must be asked as to each count.

Given the small sums of money robbed from each business in this case, in my judgment, the jury could not make a reasonable inference that interstate commerce was affected without knowing more than this record proves. The government could have met its evidentiary burden by showing that the relationship between the money stolen and the businesses' gross revenues or profits was such that interstate commerce likely or necessarily was affected. The government could have shown that the ratio of assets stolen to total company assets was such that the robbery likely or necessarily affected interstate commerce. Evidence of the company's inability to fund purchases of interstate goods from other sources could also have been shown. However, *some* evidence of this type

---

**2.** Norris was convicted as an accessory after the fact to a robbery of a Brinks armored car. The interstate commerce nexus was not described in *Norris*. However, it is not unreasonable to allow a jury to find an effect on interstate commerce when an armored car has been robbed because the armored car is in the business of facilitating the movement of cash from one business to another. The secure movement of cash among

business enterprises is an essential component of interstate commerce.

**3.** There are undoubtedly cases in which the amount stolen was so large that a jury, without more, could make a reasonable inference that interstate commerce was affected. The amounts here do not rise to that level.

was necessary for the jury to make a reasonable inference that interstate commerce was affected.

This record is devoid of any testimony or other evidence of each businesses' gross revenues, profitability, assets, credit lines, or other means of purchasing interstate goods. Thus, the government provided the jury with no predicate from which it could infer that interstate commerce was likely to be affected by the *de minimis* reduction in assets that each experienced by these robberies. Moreover, there was direct testimony in at least two of the counts, Counts Five and Six, that the companies' ability to purchase interstate goods was *not* adversely affected, or not known to be adversely affected, by the robberies and that no fewer goods were purchased as a result of the robberies.

The majority opinion attempts to overcome this lack of evidence by relying on our earlier decisions in *Boston* and *Whitt*. However, this reliance is misplaced because the jury instruction in this case differed from those used in *Boston* or *Whitt*.[4] In *Boston*, the court instructed the jury that the government had to prove that Boston "actually or potentially obstructed, delayed or affected interstate commerce or attempted to do so." *Boston*, 718 F.2d at 1516. The district court in *Boston* further instructed that:

> while it is not necessary to prove that the defendant specifically intended to interfere with interstate commerce, or attempted to do so, it is necessary as to this issue that the government prove that the natural consequences of the acts or attempted acts alleged in the indictment would be to delay, interrupt or affect "interstate commerce," which means the flow of commerce or business activities between two or more States.

*Id.* The court then instructed the jury that the government could meet its burden of proof on this element if it proved any of the following:

> (1) that the vendor was engaged in interstate commerce and depletion of the vendor's assets would be the natural consequence of the alleged extortion; (2) that Major County was engaged in interstate commerce and that a depletion of its assets would be a natural consequence of the alleged extortion; or (3) that the vendor purchased supplies from outside the State of Oklahoma which were then brought into the State and delivered to Major County as a result of the alleged extortion.

*Id.* at 1516–17.[5]

Similarly, in *Whitt*, the court instructed the jury that the government had to prove "that the natural consequences of the acts alleged ... would be to delay, interrupt, or adversely affect commerce." *Whitt*, 718 F.2d at 1500. The jurors were further told that the government could meet this burden by showing:

> (1) that the vendor was engaged in commerce and that depletion of the vendor's assets would be the natural consequence of the alleged extortion; (2) that Seminole County was engaged in commerce and that depletion of its assets would be a natural consequence of the alleged extortion; or (3) that the vendor purchased supplies from outside the State of Oklahoma which were then brought into the State and delivered to Seminole County as a result of the alleged extortion.

*Id.*[6]

---

4. Neither *Boston* nor *Whitt* discussed the extent to which a firm's assets must be depleted before an effect on interstate commerce reasonably can be inferred beyond a reasonable doubt.

5. Although we found no error in this instruction, that observation appears to have been dicta because the issue in that case was whether the *evidence* was sufficient to establish the inferences permitted by the instruction. The validity of the instructions as a matter of law does not appear to have been at issue. Appellant did argue that the instruction was a variance from the indictment, but the legal sufficiency of the jury instruction was not otherwise at issue.

6. Once again, the legal validity of the instructions was not at issue in *Whitt*, and so the court's approval of the instructions was dicta. Indeed, the court noted that the Appellant did not even argue that the instruction was spurious in that case. Instead, the issues there, as in *Boston*, were only the adequacy of the evidence and whether the instruction was a variance from the indictment.

In contrast to the *Boston* and *Whitt* instructions, the jury in the instant case was instructed as follows: [7]

The term "obstructs, delays, or affects commerce" means any action which, in any manner or to any degree, interferes with, changes, or alters the movement or transportation or flow of goods, merchandise, money, or other property in interstate commerce (commerce between any place in a state and any place outside that state).

It is not necessary for the government to prove that the defendant actually intended to obstruct, delay, or affect interstate commerce. The government must prove beyond a reasonable doubt, however, that the defendant deliberately performed an act, the ordinary and natural consequences of which would be to obstruct, delay, or affect interstate commerce, and that interstate commerce was, in fact, obstructed, delayed or affected.

You are instructed that the law requires no more than a small or minimal effect on interstate commerce.

Rec., vol. I, doc. 21 at 18. The jury instruction in the instant case guides our inquiry with respect to the jury's understanding of interstate commerce and the requisite government proof on that issue. The jury was *not* given the broad "depletion of assets" instruction that was given in *Boston* and *Whitt.*

Here, the jury had to assess whether the amounts taken were significant as to each business such that the depletion of assets "obstructed, delayed or affected interstate commerce." As discussed above, absent direct evidence that interstate commerce was affected, the jury must be given some context within which to evaluate the impact of the loss for each of the businesses robbed. In this case, I cannot conclude that the jury could make such a determination from simply knowing that the businesses involved were convenience stores, restaurants, and gas stations and the minor amounts of money taken in most instances.

Because the government did not meet its burden of proof, the convictions for Counts One through Six should be reversed.

we must assume that they were proper.

---

7. Because neither party objected to the jury instructions at issue, for the purposes of this case